(A. R. D. 32)

UNITED STATES *v.* TOM JAMISON

Entry No. 560, etc.

First Division, Appellate Term

(Decided October 22, 1953)

*Warren E. Burger*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellant.

*Philip Stein* (*Marjorie M. Shostak* of counsel) for the appellee.

Before OLIVER and MOLLISON, Judges

OLIVER, Chief Judge:   This case is before us as a review of the decision in *Tom Jamison v. United States*, 28 Cust. Ct. 610, Reap. Dec. 8110, involving certain leather riding saddles made with a smooth-stamped design as a decoration.   The articles were imported from Magdalena, Sonora, Mexico, into the port of Nogales, Ariz. The trial judge found foreign value (section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938) to be the proper basis for appraisement and held such statutory value to be 190 pesos per saddle, plus sales tax.   The conclusion of the lower court sustained the importer's entered value.

The Government, as appellant in these proceedings, claims that the proper value for this merchandise is the appraised value of 214 pesos per saddle, while appellee contends for his purchase price of 190 pesos each, plus sales tax, as found by the trial court.

The opinion of the trial judge was based on an issue expressed in his decision as follows: "The advance in price of 24 pesos each involves solely the question of what constitutes a usual wholesale quantity in the ordinary course of trade."   While we recognize the

controlling effect of that question and proceed with our discussion accordingly, our analysis of the record leads to a conclusion different from that reached by the trial court.

The record consists of the oral testimony of three witnesses, i. e., the Mexican manufacturer of these saddles, the importer of the merchandise, and the customs broker who made the entries in question, all of whom appeared on behalf of appellee (plaintiff below); and a customs agent's report, collective exhibit 2, offered by appellant (defendant below). The evidence will be summarized collectively, without outlining the testimony of each witness and the customs agent's report individually.

Several shipments are involved herein. They extend over the period from November 1944 to May 1946. The purchase price in every instance was 190 pesos for each saddle. The earliest purchases were based on "a verbal agreement as to price and number of saddles to be delivered" (collective exhibit 2). Later, the Mexican manufacturer and the importer entered into written agreements, the importer testifying that he had "two or three." There is in evidence one of those contracts, executed on May 18, 1945 (collective exhibit 1), which, as disclosed from an English translation embodied in the said customs agent's report, covers 400 saddles to be delivered "in partial shipments of 25 and 30 each fifteen days," beginning June 15, 1945, with final delivery to be completed by December 15th of the same year.

The business routine followed between the Mexican manufacturer and the American importer is explained in the customs agent's report. It appears therefrom that when a shipment of these saddles was ready for delivery, notification thereof was given to the importer's representative in Magdalena, Mexico, the place of manufacture of the present merchandise and a principal market therefor in the country of exportation. The importer's Mexican representative took delivery of the saddles and hauled them by truck to Nogales, Sonora, Mexico, at the Mexican border, where the importer accepted them, giving his representative a check in payment for the merchandise. The importer's representative, after his return to Magdalena, cashed the check and delivered the amount to the manufacturer. The manufacturer kept no record of any transaction. As stated in the customs agent's report, the Mexican manufacturer "did not maintain an official invoice book in order to avoid payment of the invoice stamp taxes," and "he kept no records whatsoever of his transactions other than a copy of a contract which he and Mr. Jamison signed on May 18, 1945."

The Mexican manufacturer of the present merchandise testified that, at the time of exportation of the saddles in question, he was the largest manufacturer of such merchandise in Magdalena, Mexico. He

stated that a wholesale quantity of saddles, the same as those in question, was "upward from 10," and that "when they purchase less than 10 saddles the price was a little higher than when they bought more than 10 saddles." The manufacturer's capacity to make sales to purchasers, other than the importer herein, in what *he* regarded as wholesale quantities of 10 or more, is disclosed in the following excerpt from his testimony:

Q. Could you have sold quantities of 10 or more to other than Jamison if you had received such orders?—A. I could not obligate myself to furnish other suppliers due to the fact that I was pretty busy with Jamison's orders.

Q. If you had such orders for quantities of 10 or more of the saddles such as you sold Jamison, could you have produced them?

\* \* \* \* \* \* \*

A. No, I could not have delivered them.

Sales to others were made, as stated by the Mexican manufacturer, when "Jamison did not call for the saddles that I had ready, and as I needed money, I had to make a trip to Nogales occasionally to sell them and get some money." In this connection, he referred to transactions with Carrasco Bros., to whom sales were made, "about four or five times," in quantities of "three; sometimes for four; sometimes eight, according to the circumstances in his store," at 214 pesos per saddle, which, as stated in the customs agent's report, the manufacturer "considered his 'retail' value and not a wholesale value." The record herein identifies the said Carrasco Bros. as a buyer of these saddles for resale in its curio store at Nogales, Ariz.

The sales to Carrasco Bros. have much significance in this controversy. It appears from the record that in those transactions the manufacturer transported the saddles from Magdalena, the place of manufacture and the principal market for the merchandise, to Nogales, Sonora, where they were delivered and accepted by Carrasco Bros., who imported the articles for resale in its store at Nogales, Ariz. The manufacturer testified that his sales price to Carrasco Bros., of 214 pesos per saddle, included "transportation charges from Magdalena to Nogales [Sonora]," and that he "absorbed the transportation charges." "It is well-settled law that a market in the sense in which the term is used in the tariff act is a place where merchandise is sold as distinguished from a place where merchandise is delivered." *United States* v. *Hallet & Carey Co.*, 68 Treas. Dec. 1286, Reap. Dec. 3668. In this case, the principal market was Magdalena where the price to the American dealer, Carrasco Bros., was 214 pesos per saddle.

The Mexican manufacturer made mention of occasional sales to tourists and also referred to one instance when he bought saddles, like those in question, at a time when his own production was insufficient to supply the orders of the present importer. All of those transactions were "sporadic sales or sales in minor quantities," and, therefore,

merit no consideration in finding the value of the saddles under consideration. *G. W. Pleissner* v. *United States*, 16 Ct. Cust. Appls. 507, T. D. 43237.

The record also makes reference to a sale by the manufacturer of the present merchandise of six saddles, the same as those in question, at $44 each (United States currency) to J. B. Stiles of Wilcox, Ariz. Whether or not this purchaser bought for his own use, or for resale, is not disclosed by the record.

At the time of oral argument of this case, attention was directed to a sale of 22 saddles by this manufacturer at 190 pesos per saddle, covered by consular invoice, 394, dated December 7, 1945, and referred to in the customs agent's report. It was argued that the said sale supports the importer's position that "upward from 10" constitutes a wholesale quantity of the present merchandise. An examination of the appeals now before us reveals that consular invoice 394, dated December 7, 1945, attached to entry 644, is covered by reappraisement 164455-A, being one of the invoices covered by this proceeding. In other words, that transaction is included among the shipments that are the subject of this litigation and, therefore, must be within the terms of one of the contracts or agreements entered into between the Mexican manufacturer and the American importer of the present merchandise. It follows therefrom that the sale of 22 saddles referred to lends no support to the importer's contention.

The testimony of the importer of the saddles in question includes a statement that he considered a wholesale quantity of these articles to be "no less than 10." The statement, as it appears in the record before us, is merely a buyer's idea of what a wholesale quantity should be, rather than the quantity in which the merchandise is usually bought and sold, and, therefore, is entitled to no weight herein. *United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, 1 Cust. Ct. 591, Reap. Dec. 4376.

We have outlined in detail all references to sales appearing in the present record because of the importance that actual sales of saddles, such as those in question, bear toward a determination of the usual wholesale quantity, which, as hereinabove stated, is the crux of the present case.

It is a well-established principle that the usual wholesale quantity is the wholesale quantity in which the major portion, or greatest number, of sales or offers for sale, is made. *G. W. Pleissner* v. *United States, supra; United States* v. *Minkus*, 21 C. C. P. A. (Customs) 382, T. D. 46912. Sales to dealers who purchase for the purpose of resale also may be a consideration in determining the usual wholesale quantity. *Jenkins Brothers* v. *United States*, 25 C. C. P. A. (Customs) 90, T. D. 49093. A discussion of the *Jenkins Brothers* case is pertinent. In that case, the merchandise consisted of gauge glasses. Among the

three classes of purchasers to whom the foreign manufacturer sold the merchandise was included the category, "Retail," that related to purchases for resale to users. The material evidence in the case was an affidavit, executed by the managing director of the manufacturer, stating, so far as concerns the present discussion, that sales under the head "Retail" related to "Gauge Glasses sold by my Company to retail firms who are selling only to users. Such sales comprise a diversity of sizes and lengths * * * of Gauge Glasses in comparatively small lots and are not sales in the usual wholesale quantities and in the ordinary course of trade, * * *." The court's consideration of that evidence and legal effect given thereto are set forth as follows:

It is true that the affidavit of said Moncrieff states that sales to retailers for resale are not in the usual wholesale quantities, but this is merely a conclusion by him, drawn from the facts set out in detail in his affidavit. While a statement that a given quantity is or is not a usual wholesale quantity might in some circumstances be regarded as some substantial evidence of the fact, such a statement can have no weight as a statement of fact when all of the facts upon which the statement is made are disclosed. It then becomes merely a conclusion of the witness, which can have no weight with the court in determining what is a usual wholesale quantity.

The question therefore is, may sales to retailers of one dozen or more gauge glasses at a time, for resale, be considered in determining what are usual wholesale quantities in the sale of merchandise such as is here involved. Appellant has cited no authority to the effect that it is improper to take into consideration sales to retailers, for resale, in determining what are usual wholesale quantities. Of course, such sales are not the sole determining factor, but it is clear that they should be considered, together with other sales in wholesale quantities, in determining what are usual wholesale quantities. See *Goldmark & Sons Corp.* v. *United States*, 22 C. C. P. A. (Customs) 358, T. D. 47378.

\*        \*        \*        \*        \*        \*        \*

Were we to adopt appellant's theory and hold that sales by a manufacturer or wholesaler to a retailer, who purchases for resale, may not be considered in determining the usual wholesale quantities of merchandise, it would in many cases be impossible to arrive at the foreign value of merchandise, when, under another construction which we hold is proper, all of the statutory elements may be present to enable the finding of such value.

The reasoning employed in the *Jenkins Brothers* case, *supra*, has equal application in this case. Here, it is shown that the Mexican manufacturer sold for export to the United States to at least one dealer who bought for the purpose of resale. Those sales are not to be taken as the sole determining factor, but they should be considered in finding the usual wholesale quantity herein. The nature of the present merchandise, i. e., riding saddles valued between 190 pesos and 214 pesos each, is a consideration in reaching our conclusion.

In the light of the foregoing, it can be said that sales for export to the United States of saddles, such as those under consideration, were

made at different prices that varied according to the quantity purchased. Sales to the present importer were based on agreements, written and oral, between the manufacturer and the importer. Only one of the agreements is in evidence, covering a sale of 400 saddles. The record is silent as to the number specified in the other agreements. The sales by this manufacturer to the dealer for resale are not set forth to show the actual number of sales so made and the particular quantities covered thereby. To summarize the foregoing: We cannot find, on the present state of the record, the quantity in which the majority of the sales were made, and, therefore, under the prevailing authorities cited, *supra*, we are unable to determine the usual wholesale quantity in which merchandise, such as that under consideration, was sold at the time involved herein.

The record, as we have analyzed it, indicates only an export value for the articles in question. If foreign value has any application, it must relate to saddles similar to those under consideration. The evidence adduced herein by the parties is wholly insufficient to discuss statutory foreign value.

In view of all the circumstances, it is our opinion that the interests of justice will be best served by giving the parties an opportunity to offer proof for a proper determination of the value of the present merchandise.

Accordingly, the judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with the views herein expressed.

Judgment will be rendered accordingly.