(Reap. Dec. 9280)

TOM JAMISON v. UNITED STATES

Entry No. 560, etc.

(Decided on remand [A. R. D. 32] December 22, 1958)

*Stein & Shostak (Marjorie M. Shostak* of counsel) for the plaintiff.
*George Cochran Doub,* Assistant Attorney General (*Samuel D. Spector,* trial attorney), for the defendant.

JOHNSON, Judge: The merchandise in these cases, listed in schedule "A," attached hereto, consists of hand-stamped leather riding saddles imported from Mexico between November 18, 1944, and May 6, 1946, inclusive. Twenty-nine importations are involved herein, each including 20 to 34 saddles, manufactured by A. Gamez of Magdalena, Sonora, Mexico, and imported by Tom Jamison, Nogales, Ariz. Most of the shipments were made at intervals of about 2 weeks, but there were a few intervals of a month or more. The merchandise was invoiced at 190 pesos (Mexican currency) per saddle, entered at the invoice value, plus sales tax, and appraised at 214 pesos each.

When this case was first before me, I held that foreign value, as defined in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, was the proper basis for the determination of the value of the merchandise and that such value was 190 pesos each, plus sales tax. *Tom Jamison* v. *United States*, 28 Cust. Ct. 610, Reap. Dec. 8110.

On appeal to the first division of this court, said decision and judgment were reversed and the case remanded for the purpose of giving the parties an opportunity to offer further proof as to the usual wholesale quantities in which this merchandise was freely offered to all purchasers. *United States* v. *Tom Jamison*, 31 Cust. Ct. 468, A. R. D. 32.

Thereafter, an additional hearing was held before me and further evidence presented.

At the original hearing, three witnesses testified on behalf of the plaintiff: Tom Jamison, the importer; Alejandro Gamez, the manufacturer; and Manuel Enciso, customhouse broker. There were received in evidence a contract between Mr. Jamison and Mr. Gamez, dated May 18, 1945 (plaintiff's collective exhibit 1), and a report of Customs Agent Benjamin S. White, Jr., dated August 30, 1946 (defendant's collective exhibit 2).

From this evidence, it appears that Mr. Jamison purchased saddles from Mr. Gamez in 1944, 1945, and 1946, and possibly in 1943. According to Mr. Jamison, when he first went into the saddle business, in 1943, he purchased cheaper saddles in quantities of 5 to 10. Thereafter, the majority of the saddles he purchased were of the type before me and were bought from Mr. Gamez for 190 pesos each, at Magdalena, Sonora, Mexico, a principal market and the place of manufacture. These purchases were made pursuant to verbal agreements and written contracts, of which there were two or three. The contracts called for 50 saddles a month or 25 every 2 weeks, delivery to be taken at Magdalena. One contract was introduced into evidence as plaintiff's collective exhibit 1. According to this contract, Mr. Gamez was to manufacture 400 saddles for Mr. Jamison of the smooth-stamped type and of the hand-tooled type, at the price of 190 pesos each for the first and 265 pesos each for the second. They were to be manufactured and delivered in partial shipments of 25 to 30 saddles every 15 days between June 15 and December 15, 1945.

Mr. Jamison testified that the prices were the same during the entire period involved herein; that he was not given a better price than anyone else and did not get the entire output of the manufacturer. He said he could have purchased the same or similar merchandise from other manufacturers in Magdalena at the same price. He never purchased such saddles in quantities of less than 10 and considered a wholesale quantity to be no less than 10.

Mr. Gamez testified that he freely offered such saddles to the public in wholesale quantities at 190 pesos each during the period from 1944 to 1946; that he considered 10 saddles or more a wholesale quantity; that the price to purchasers of less than 10 was a little higher. However, since he had such a large order from Jamison, there were few occasions when he was able to offer more than 10 to other buyers. He stated:

I had my established value of 190 pesos for lots of more than 10, and naturally when the order did not exceed 10, I had to protect myself and get a little bit more.

X Q. In other words, you based your prices on quantity purchases, is that right?

      *         *         *         *         *         *         *

THE WITNESS: When I sold more than 10 saddles, I got 190 pesos, and when the order was less, I got a little more.

BY MR. SPECTOR:

X Q. It didn't make any difference who bought the saddles, if they bought less than 10 saddles you would charge more money?—A. Yes, when the order was less than 10, I charged them more than 190 pesos.

The witness explained that he sold saddles to tourists who came to his shop for 210 or 220 pesos each. He also said that, occasionally, when Mr. Jamison did not call for the saddles he had ready and he (the witness) was in urgent need of money, he took saddles to Nogales, Sonora, Mexico, and sold them there at a higher price, which included the transportation charges amounting to about one dollar. He remembered selling some to Carrasco Bros. in Nogales at 214 pesos each, in quantities of 3, 4, or 8. One of these sales is referred to in the report of the customs agent, which states:

* * * According to Mr. Gamez, the 214.00 pesos charged Carrasco Hermanos was what he considered his "retail" value and not a wholesale value. No verification of Mr. Gamez' statements was available.

Another sale referred to in the report included six plain saddles identical to those involved herein at $44 each, covered by an entry made by J. B. Stiles at Nogales, Ariz., on June 5, 1944.

Both Mr. Jamison and Mr. Gamez stated that similar saddles were offered by other manufacturers in Magdalena at 190 pesos each in wholesale quantities and that such saddles could be purchased at other markets further south at lower prices. Mr. Gamez stated that he had purchased some from one Salazar in Hermosillo at 180 pesos and had sold them at 190 pesos, to fill Mr. Jamison's order.

At the rehearing, Fernando Gallego testified that, during the period from November 1944 to the summer of 1946, he had been employed and paid by Mr. Jamison to haul saddles for him from Magdalena to Nogales. He picked up the saddles from Mr. Gamez when they were ready, and delivered them to Mr. Jamison who gave him a check for Mr. Gamez. On receiving the check, Mr. Gamez gave him a

receipt which he forwarded to the broker. A packet of these receipts was received in evidence as plaintiff's collective exhibit 2.

There were also received in evidence an affidavit of Lino Carrasco Bravo, dated January 20, 1958 (plaintiff's exhibit 3), and an affidavit of Alejandro Gamez, also dated January 20, 1958 (plaintiff's exhibit 4).

The affiant, Lino Carrasco Bravo, stated that he was the proprietor of Carrasco's Curio Store; that, during March 1944, said store purchased 5 plain leather saddles from Alejandro Gamez at Nogales, Sonora, Mexico, at 214 pesos each; that, on a few other occasions during 1944 and 1945, the store purchased a few saddles of the same type from Alejandro Gamez at Nogales at the same price; and that it never purchased saddles from Gamez at Magdalena.

In his affidavit, Alejandro Gamez stated that, in 1944, 1945, and 1946, he sold saddles to Tom Jamison in wholesale quantities of 25 saddles every 2 weeks at Magdalena, Sonora, Mexico; that he offered such saddles for sale at Magdalena at a price of 190 pesos each to anyone who cared to purchase in wholesale quantities of 10 or more; that he occasionally sold saddles to tourists and others in quantities of 1 or 2 at higher prices; that he occasionally sold a few saddles at Nogales, Sonora, Mexico, at a higher price than that charged in Magdalena; that, under ordinary and usual trading conditions, he regularly sold saddles produced by him in Magdalena, which was the principal market where he offered them; that he occasionally made sales to Carrasco Hermanos at Nogales, Sonora, Mexico, at prices including an amount added for the expense for transportation.

Defendant introduced into evidence a report of Acting Customs Agent H. K. Street, dated December 31, 1953 (defendant's exhibit B). According to this report, the writer endeavored to secure copies of additional contracts between Mr. Gamez and Mr. Jamison, but Mr. Gamez recalled only the one, heretofore referred to, and his attorney and the notary public at Magdalena said there were no other existing written contracts.

The customs agent was unable to locate J. B. Stiles in order to obtain information about the sale of saddles to him. As to the sales to Carrasco Bros., the report stated:

* * * Mr. Carrasco states from memory that on occasions Alejandro Gamez of Magdalena, Sonora, Mexico, sold to him saddles in lots of 3, 4 or 8; that no prior orders were placed for this merchandise, but whenever Mr. Gamez had the merchandise on hand, he would come to Nogales, and sell whatever merchandise he had available, to the Carrasco Brothers; that the price usually ranged from 210 pesos to 214 pesos for stamped saddles, and 190 pesos for plain leather saddles. Mr. Carrasco had no positive recollection of what he sold these saddles for in Nogales, Sonora, Mexico, as they were sold to tourist trade, and they charged whatever prices they could get for them.

\* \* \* \* \* \* \*

Agent White's report reflects that Alejandro Gamez sold retail to Carrasco Brothers of Nogales, Sonora, Mexico, saddles at 214 pesos each. Mr. Gamez

stated to the undersigned that the 214 peso price was both his wholesale and retail price. The price to Tom Jamison was a special price under this particular contract.

Plaintiff claims that the record establishes that the saddles involved herein were freely offered for sale to all purchasers in the principal market of Magdalena, Sonora, Mexico, in the usual wholesale quantities of 10 or more, at 190 pesos each.

Defendant claims that the evidence introduced at the rehearing did not cure the defects found by the first division and that the sales to Carrasco Bros. at 214 pesos each represent the price at which the merchandise was freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade.

The record before me contains positive testimony by both the manufacturer and the importer that a wholesale quantity was no less than 10. The manufacturer stated further both in open court and in his affidavit that he freely offered his saddles for sale at Magdalena, the place of manufacture, at 190 pesos each in quantities of 10 or more, and at higher prices in quantities below 10, and that he considered 10 or more the wholesale quantity. Although there is a statement in the report of Acting Customs Agent Street to the effect that Mr. Gamez said that 214 pesos was both his wholesale and retail price and that his price to Tom Jamison was a special price, the actual testimony of Mr. Gamez is clearly entitled to greater weight.

In support of that testimony is the continuous course of dealing between the manufacturer and the importer, pursuant to which a quantity of approximately 25 saddles was manufactured and delivered to the purchaser at Magdalena about every 2 weeks at 190 pesos each. One written contract covering 400 saddles to be delivered in this manner was received in evidence. The testimony shows that there were other agreements, verbal and written, and the record establishes that there were many shipments in quantities of about 25 saddles and that the price was 190 pesos each.

Although the evidence indicates that because the importer took such a large part of Mr. Gamez' production, he did not often have sufficient merchandise to sell 10 or more saddles at a time, he was not required to sell his entire output to Mr. Jamison and did sell saddles to other purchasers. He stated that he freely offered his merchandise to all purchasers in wholesale quantities of 10 or more at 190 pesos each. Where offers are made to all purchasers, even though sales are made only to purchasers of large quantities because of limited output, the statutory requirements have been met, since it is provided that the value of imported merchandise shall be the price at which it is freely offered for sale to all purchasers. *F. W. Myers & Co., Inc.* v. *United States*, 38 Cust. Ct. 569, Reap. Dec. 8728; *International Commercial Co., Inc., et al.* v. *United States*, 26

Cust. Ct. 607, Reap. Dec. 7980, affirmed *sub nom United States* v. *International Commercial Co., Inc., et al.*, 28 Cust. Ct. 629, Reap. Dec. 8112; *Robinson & Co. et al.* v. *United States*, 13 Ct. Cust. Appls. 644, T. D. 41486; *Oceanic Trading Co.* v. *United States*, 21 C. C. P. A. (Customs) 146, T. D. 46478; *United States* v. *T. E. Ash et al.*, 22 C. C. P. A. (Customs) 395, T. D. 47401.

The manufacturer said that he sold saddles in small quantities and usually at higher prices to tourists who visited his shop. These, the appellate division held to be sporadic sales and not to be considered in determining value. Whether or not the sale to J. B. Stiles, mentioned in the report of Customs Agent White, was a sale to a tourist or to a dealer does not appear. In any event, it is not entitled to much weight since it occurred several months prior to the first importation herein.

Defendant relies upon the sales made to Carrasco Bros. as establishing the proper dutiable value of the within merchandise. These were sales to a dealer for resale, but were made occasionally and not pursuant to orders, in quantities of from 3 to 8, and only when Mr. Gamez was in urgent need of money and brought his merchandise to Nogales.

In my view, the sales to Carrasco Bros. should not be considered in determining the proper dutiable value of this merchandise for the following reasons: These sales were not made in the ordinary course of trade, but only when the manufacturer was in need of money and, therefore, made the trip from Magdalena to Nogales, a distance of about 55 miles over unpaved roads. Furthermore, these sales were made in Nogales and not in Magdalena.

The record establishes and the appellate division has found that the principal market for these saddles was Magdalena. While there is evidence that there were other principal markets for saddles in Mexico farther south, there is nothing in the record to show that Nogales was a principal market. Under the statute, the price at which the merchandise was offered in any market other than a principal market is no evidence of value, nor is the usual wholesale quantity in a market other than a principal market evidence of the usual wholesale quantity in a principal market. *United States* v. *Pacific Customs Brokerage Co.*, 72 Treas. Dec. 1169, Reap. Dec. 4159, affirmed 1 Cust. Ct. 586, Reap. Dec. 4369. Even were Nogales considered a principal market, since this merchandise was purchased at another principal market, Magdalena, it must be appraised at the value in that market. *J. R. Simon & Co. et al.* v. *United States*, 38 Treas. Dec. 443, T. D. 38413; *United States* v. *American Import Co.*, 8 Cust. Ct. 737, Reap. Dec. 5642.

On the entire record, I conclude that the majority of sales in wholesale quantities in the ordinary course of trade at the principal market

of Magdalena, Mexico, was in quantities of 10 or more and that the merchandise was freely offered for sale to all purchasers in such quantities in the ordinary course of trade at 190 pesos each, both for home consumption and for exportation to the United States.

I find as facts:

1. The merchandise involved in this case consists of hand-stamped leather saddles imported from Mexico during the period from November 18, 1944, to May 6, 1946, inclusive.

2. That said saddles were manufactured by Alejandro Gamez at his shop in Magdalena, Sonora, Mexico, and were purchased by and delivered to the importer at Magdalena.

3. That Magdalena, Sonora, Mexico, was one of the principal markets wherein such saddles were freely offered for sale to all purchasers.

4. That at the time of exportation of these saddles the usual wholesale quantities in which such merchandise was freely offered for sale to all purchasers in the ordinary course of trade both for home consumption and for exportation to the United States consisted of 10 or more saddles.

5. That the price of such saddles in such wholesale quantities was 190 pesos each.

I conclude as matters of law:

1. That the foreign value, as defined in section 402 (c) of the Tariff Act of 1930, as amended, and the export value, as defined in section 402 (d) of said act, is the same.

2. That the proper basis for determining the value of this merchandise is such foreign and export value.

3. That such foreign and export value of the saddles in question is 190 pesos each, plus sales tax, which is the entered value thereof.

Judgment will be rendered accordingly.