(A.R.D. 285)

AGRICOLAS DE MEXICO, S. DE R. L. DE C. V. *v.* UNITED STATES

Second Division, Appellate Term

(Decided April 27, 1971)

*Stein & Shostak* (*Marjorie M. Shostak* of counsel) for the appellant.
*L. Patrick Gray, III*, Assistant Attorney General (*Mollie Strum*, trial attorney),
for the appellee.
Before RAO, FORD, and NEWMAN, Judges

RAO, Chief Judge: This is an application for review of a decision and judgment in reappraisement sustaining the appraised values of cantaloupes imported from Mexico during the period March 25 through April 3, 1965. *Agricolas de Mexico, S. de R. L. de C.V.* v. *United States*, 64 Cust. Ct. 591, R.D. 11689 (1970), rehearing denied March 18, 1970.

The cantaloupes involved herein were purchased from growers by Productos Agropecuarios de Mexico S. de R.L. de C.V. (hereinafter referred to as Productos) at its packing shed in Tusantla in the Zitacuaro area of the State of Michoacan, Mexico. They were packed in so-called Batley or Jumbo crates, according to size, designated as 27, 36, 45, 56, and 64. For example, "64" indicated that there were 64 cantaloupes of a uniform size in the crate, 64 being the smallest size fruit. The merchandise involved herein was described on the invoices

as "Zitacuaro Cantaloupes, 'Gracias' label, Mexico pack" and also as to one entry as Zitacuaro cantaloupes "Pearl" label. The appraised and claimed values are as follows:

"Gracias" Mexico pack;
Batley crates:

|  | Appraised, net packed (Mexican currency) | Claimed (Mexican currency) |
|---|---|---|
| 36 | 51. 30 | 20 plus packing |
| 45 | 41. 30 | 20 " " |
| 56 | 36. 30 | 10 " " |

"Gracias" Mexico pack;
Jumbo crates:

|  |  |  |
|---|---|---|
| 36 | 50. 30 | 20 " " |
| 45 | 40. 30 | 20 " " |

"Pearl"; Batley crates:

|  |  |  |
|---|---|---|
| 27 | 56. 30 | 40 " " |
| 36 | 66. 30 | 45 " " |
| 45 | 56. 30 | 40 " " |
| 56 | 41. 30 | 20 " " |

The cantaloupes were examined by the appraiser and assessed with duty on the basis of whether they were of export quality No. 1 or export quality No. 2. Appellant claims that those appraised as export quality No. 1 were in fact of a grade known as "Commercial" or "Exportacion" which consisted of a mixture of fruit in grades 1 and 2 and had a lower value, and that the cantaloupes appraised as export quality No. 2 were of a lesser quality, known as "Mexico Pack" and had a lower value.

The parties are in agreement that export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the correct basis of appraisement and that the merchandise is not included on the Final List, 93 Treas. Dec. 14, T.D. 54521.

The record consists of the testimony of two witnesses called by the appellant, two witnesses called by the appellee, and 12 documentary exhibits. Appellant claims that two additional documents, excluded by the trial court, should have been admitted into evidence.

The trial judge found that appellant had produced extensive evidence as to the business practices of Productos and as to the prices it paid to the growers during the period involved herein. It was held, however, that this was insufficient to establish the prices at which the merchandise was freely sold or offered for sale to all purchasers within the meaning of section 402(b) of the Tariff Act of 1930, as amended. The court stated that on the basis of their investigations both Customs Agent Simmons and Appraiser Kelly said that they had failed to find an open market for the sale of cantaloupes; that there was but one shed in Tusantla where the growers could sell their cantaloupes; and that it paid a lesser price than other sheds. The court found further that the

record was devoid of affirmative evidence to establish that the imported cantaloupes were in fact of a different grade than that found by the appraiser.

It appears from the record presented that cantaloupes are purchased from growers by packers who maintain sheds in various parts of Mexico where the cantaloupes are sorted into grades. The prices paid the growers vary in accordance with the grade and size of the fruit. A number of grade names have been used by the packers and customs officials. These include No. 1, No. 2, Exportacion, Commercial, Mexico or Mexico Pack, Nacional, and Pachanga. The last are culls and are not exported to the United States. In an effort to facilitate the appraisement of cantaloupes, customs officials make a survey of conditions in Mexico from time to time, receive reports of prices from the packers, and set up schedules of grades and prices. In 1965 the then appraiser at Laredo, Mr. Ornes, notified those concerned (exhibit 2):

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Further, when above method of appraisement was developed, I understood that the "export quality" fruit consisted of two grades only, to wit, #1 and #2. However, besides above two qualities of fruit, shipments were made described as "Commercials", "Mexico Packed", and "Nacional", thus increasing our difficulties in appraisement and forcing us to make closer examination of the shipments.

Some importers complained that the value information presented to this office for the last three qualities mentioned above was not accurate, because the fruit had been purchased at the same price as No. 1 or the No. 2 export quality melons.

Therefore, beginning this season, we contemplate to consider all melons as of "export quality" and appraise them at the prevailing prices of No. 1 or No. 2 fruit, as the case may be.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Accordingly, the merchandise involved herein with the Pearl label was appraised as No. 1 quality and that with the Gracias label as No. 2 quality. It is presumed that the appraiser found that the imported fruit was in fact of those qualities and that such or similar merchandise was freely sold or offered for sale to all purchasers in the principal markets of Mexico in the usual wholesale quantities and in the ordinary course of trade at the appraised values.

Appellant has the burden, therefore, of establishing that the imported merchandise was freely sold or offered for sale to all purchasers in accordance with the statute at the claimed values.

Appellant is seeking to establish that the imported merchandise did not conform to the grades found by the appraiser by showing that Productos did not pack grades No. 1 and No. 2, but shipped different

grades, which it designated Commercial or Exportacion, and Nacional or Mexico.

Mr. Rocha-Freyre, general manager of Productos, testified that his firm sorts cantaloupes into three grades, Exportacion, Nacional, and Pachanga, and that Exportacion is a combination of No. 1 and No. 2 and that Nacional is a lower quality than No. 2. He described No. 1 as fruit which is perfect in configuration and absolutely clean in color. Fruit graded as No. 2 has slight stains on the outside, because of excessive sunshine, too much shade or the hot ground where it is stored. He said that Nacional is a lower quality than No. 2.

Harry G. Kelly, who had made the annual cantaloupe trip to Mexico in February, 1965, when he was customs liaison officer, described No. 1 as of better quality, mature, full slip, healthy net, full net. He said that fruit in grade No. 2 had a larger number of imperfections, but that it was graded, selected and packed in Mexico in the same fashion as No. 1. He added that there was a third grade of lesser quality, packed for the Mexican markets, which could not be exported to the interior or eastern markets of the United States.

An affidavit of Agustin Plancarte Loya, a grower (exhibit 5), states that Productos sorted cantaloupes into three grades and that other packing firms made up to four grades; that the "Pearl" grade includes No. 1 and No. 2 of other firms and that the "Gracias" grade is the same as the Mexico Pack or Nacional of other firms. See also to the same effect that affidavit of Hector Sanchez Perez (exhibit 6).

An affidavit of another grower, Jorge Esteban Fajer (exhibit 8), states that Productos did not buy No. 1 and No. 2 but limited itself to the quality designated Commercial which was a mixture of No. 1 and No. 2, and that the grade designated as Nacional could not be classified as grade 1, 2 or Commercial since the fruit was less perfect in shape and the appearance was less favorable because of sun spots, scorching, and excessive shade spots. See to the same effect the affidavits of Pedro Avila Benime (exhibit 9) and Enrique Perez Suarez (exhibit 10).

Mr. Kelly testified that one association in Mexico was using the term Mexico Pack and that it was what other people were shipping as No. 2. In his opinion the term Exportacion referred to a grade commonly known as Commercial pursuant to U.S. Department of Agriculture grading standards, which provided for Fancy, No. 1, Commercial, and No. 2. The witness stated that he had never observed a true Commercial pack in the sheds he visited; that what was packed under that designation was the same quality fruit as everyone else in the trade called No. 1. Also as a result of his investigation he came to the conclusion that cantaloupes designated as Mexico Pack were in fact No. 2 export quality and were so recognized in the industry. In his

opinion the true Nacional would not be shipped to the United States because it would not arrive at the interior and eastern markets in marketable condition. Mr. Kelly pointed out further that Department of Agriculture standards were not used for appraisement purposes and that the Mexican packers did not use them.

There was also received in evidence a report of Customs Agent Earl W. Simmons who had visited the cantaloupe growing areas of Mexico from April 12 through April 25, 1965 to verify value information (exhibit B). This report indicates that the Mexican industry divides cantaloupes into three categories: Exportacion, Nacional, and Pachanga. According to the report when the fruit is received at the shed, the Pachangas are removed and the Nacionals and Exportaciones segregated. The report states:

> * * * The export melons usually go to one side of the shed while the Nacionals go to another. The export melons are then selected according to size and placed in newly constructed crates of new lumber. They are then transported to railroad cars where they are immediately iced.

> On the other hand the Nacionals, after being segregated from the Exportaciones are either trucked in bulk to the Mexican market, dumped in crates for the Mexican market, or, in rare instances, sized and packed for the markets in the interior of Mexico. * * *

> Shippers that pack and export number two quality employ one of two devices:

> 1. After a very strict selection is made of the Exportacion for export number one, the remainder is called export number two. This method is employed by such firms as Elmore and Stahl who select the best fruit available for their number one export label and when the quality begins to decrease, pack an export number two.

> 2. The other method employed is by making a selection of the Nacionals and referring to them as export number two. This selection is usually made without the knowledge of the producer and he is paid a Nacional price although these cantaloupes are imported into the United States.

At the trial, Mr. Simmons testified that as a result of his conversations with growers, he concluded that they thought that Exportacion cantaloupes were for export and Nacionals destined for the Mexican market.

This evidence indicates that the appraiser divided cantaloupes into two grades, No. 1 and No. 2, and that the Mexican packers divided them into three grades, Exportacion, Nacional, and Pachanga. It appears that No. 1 was better than No. 2 and that Exportacion was better than Nacional. It also appears that Exportacion was divided into No. 1 and No. 2 by some packers and that the grade known as Nacional was gen-

erally destined for the Mexican market. Appellant claims that the merchandise Productos called Exportacion or Commercial was in fact a grade in between No. 1 and No. 2, and that the merchandise it called Mexico was below No. 2 in quality. Mr. Kelly concluded the contrary. Whether the imported merchandise was in fact of a grade between No. 1 and 2 or below No. 2 would have to be shown by testimony of someone who saw the merchandise and could distinguish the gradations. Since none of the witnesses saw the imported fruit, we cannot hold that the appraiser erred in finding some of it No. 1 and some of it No. 2.

Appellant claims that, nevertheless, the record establishes export values for the imported merchandise lower than the appraised values. It contends that the merchandise should be appraised on the basis of the prices actually paid by Productos to the growers. The receipts comprising collective exhibit 4 are evidence of the amounts paid by Productos for Exportacion and Mexico cantaloupes. They correspond to the values claimed by appellant.

However, the price paid, standing alone, is insufficient to establish export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended.[1] It must also be shown that the merchandise was freely sold or offered for sale at such prices in the principal markets of the country of exportation to all purchasers in the usual wholesale quantities and in the ordinary course of trade. *United States* v. *Manahan Chemical Co., Inc.*, 24 CCPA 53, T.D. 48333 (1936); *Sears, Roebuck & Co., et al.* v. *United States*, 31 CCPA 36, C.A.D. 246 (1943); *L. H. Graves* v. *United States*, 61 Cust. Ct. 580, A.R.D. 242, 287 F. Supp. 611 (1968); *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, C.A.D. 846 (1964).

Appellant also claims that the prices paid for "such" merchandise, represented by actual sales by the growers to Productos, must prevail over sales used for appraisement purposes, which must have been by other growers in other areas. However, the prices paid must, nevertheless, be in accord with statutory export value. Section 402 (f)(4).[2] Prices shown by actual sales are to be disregarded when they are not those at which the merchandise is freely sold to all purchasers at wholesale. *Aceto Chemical Co., Inc.* v. *United States, supra.*

[1] (b) For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

[2] (4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

Is the record presented sufficient to establish that the sales by the growers to Productos met all the requirements of the statute?

There are three affidavits of growers in the Zitacuaro area stating that the affiants sold freely to Productos receiving the just open market price and that they had no indebtedness for loans, advances, or contracts nor a moral reason obligating them to sell to Productos. (Exhibits 8, 9 and 10.) The affiants do not state that they offered their cantaloupes to anyone else. References are made to other packing sheds in the area, but no specific names or locations are given.

Mr. Rocha admitted that Productos paid a lower price than other sheds and stated that he was told this by the growers who came to him to offer cantaloupes. One explanation as to why they would sell at the lower prices may be that Productos was the only packer in Tusantla at the time. There is evidence that there were other sheds in Zitacuaro (31 miles away over a bad road) but, according to exhibit B, only one was in operation at the period involved herein. It packed 95% from its own fields and purchased 5%.

A second explanation for sales at lower prices may be because of financing arrangements. Mr. Rocha testified that Productos did not control any of the growers or lend them money prior to or during the 1965 season, but he did not know whether anyone else did. He stated that Productos did not purchase the shed at Tusantla until February 4, 1965, at which time cantaloupes were already being harvested. The shed was purchased from Jose Garcia who then became an employee of Productos. Mr. Rocha did not know whether Mr. Garcia financed any farmers in 1965.

Mr. Kelly testified that when he was in Tusantla he had talked with a Mr. Manuel Correa who claimed that the shed was owned and operated by him and that he purchased fruit only from those whom he was financing. Mr. Kelly concluded that there were no unencumbered sales in Tusantla as one would expect in a free market.

Mr. Rocha testified, on the other hand, that Manuel Correa was a purchasing agent for Productos. The receipts in collective exhibit 4 indicate that he sold cantaloupes to Productos.

In view of this record, it is doubtful, as held by the trial judge, that the prices paid by Productos are the prices as which such or similar merchandise was freely sold, or in the absence of sales, offered for sale in the principal markets of Mexico in the usual wholesale quantities and in the ordinary course of trade. The term "freely sold, or in the absence of sales, offered for sale," as defined in section 402(f)(1).

\*          \*          \*          \*          \*          \*          \*

means sold or offered (A) to all purchasers at wholesale or (B) to selected purchasers at a price which fairly reflects market value. In the instant case it appears that the merchandise was sold to Productos

only. Whether offers were made by the growers to anyone else does not appear. It has been held that where the merchandise is sold only to one purchaser, in order to establish the price as export value, it must be shown that there were offers to sell to other purchasers. *D. N. & E. Walter & Co.* v. *United States*, 38 Cust. Ct. 634, Reap. Dec. 8790 (1957) *Tom Jamison* v. *United States*, 42 Cust. Ct. 429, Reap. Dec. 9280 (1958). While Productos does not appear to be a selected purchaser within the meaning of section 402(f) (1) (B) (*Haddad & Sons, Inc.* v. *United States*, 54 Cust. Ct. 600, 609, Reap. Dec. 10942 (1965), aff'd 56 Cust. Ct. 792, A.R.D. 205 (1966), if it were, it would be necessary to show that the prices it paid fairly reflected market value.

Appellant claims further that should the evidence before the court be deemed insufficient, the case should be remanded to the trial court for admission of certain affidavits (collective exhibits 11 and 11A and 12 and 12A for identification) or the presentation of other evidence in lieu thereof.

These affidavits were not offered in evidence at the trial but were subsequently offered and denied admission upon a motion to set aside the submission and later upon a motion for a rehearing. Admission was denied on the ground that the affiants were within the jurisdiction of the court at the time of trial. The case was reopened, however, for the receipt of affidavits of Mexican nationals (exhibits 5 through 10).

Collective exhibit 11 and 11A for identification consists of an affidavit of Earl H. Childs executed on May 3, 1967 and attachments. Mr. Childs was then an inspector employed by the Texas Federal Inspection Service and was assigned to the Laredo area. He was not called to testify at the trial either because he had not obtained authorization to testify from the State and Federal agencies by which he was employed or because counsel was unable to have a subpoena served on him.

Appellant is now claiming that Mr. Childs is an officer of the Government and that his affidavit is admissible, whether or not his attendance could reasonably have been had, pursuant to 28 U.S.C. 2633, which provided, prior to the enactment of the Customs Courts Act of 1970:

> In finding the value of merchandise, in reappraisement proceedings before a single judge of the Customs Court, affidavits and depositions of persons whose attendance cannot reasonably be had, price lists and catalogues, reports or depositions of consuls, customs agents, collectors, appraisers, assistant appraisers, examiners, and other officers of the Government may be admitted in evidence. * * *

Under that section, *affidavits and depositions* of persons whose attendance cannot reasonably be had are admissible, and *reports or depo-*

*sitions* of the enumerated officials and other officers of the Government are admissible. Thus, whether or not Mr. Childs is an officer of the Government within the meaning of the statute, his *affidavit* is not admissible solely on the ground that he is a Government official. Since his attendance could reasonably have been had, it was not error to refuse to admit his affidavit into evidence.

The other document claimed to be admissible is an affidavit of Edwin L. LaGrange, collective exhibit 12 and 12A, now deceased, executed at Rio Grande City, Texas, on April 6, 1967. It appears from the affidavits submitted in connection with the motions heretofore mentioned that Mr. LaGrange resided 99 or 100 miles from Laredo and that at the time of trial he was suffering from lung cancer, was recuperating from surgery, was bedridden, and could not have come to Laredo to testify. It is evident, therefore, that his attendance at the trial could not reasonably have been had. Since his affidavit contains statements relevant to the issues herein, it should have been admitted in evidence.

Therefore, the case is remanded to the trial judge for the admission into evidence of collective exhibit 12 and 12A for identification and for reconsideration of the issues in the light of all the evidence. *Clayton Chemical & Packaging Co.* v. *United States*, 383 U.S. 821 (1966).

Judgment will be entered accordingly.