United States for consumption of imported Tricaphos was $2.00 per short ton.

13. Subsequent to the incorporation of the Seattle branch it purchased the importations from Mitsui & Co. Ltd. of Japan.

14. During that period the merchandise was not sold for export by Mitsui & Co. Ltd. to all purchasers at wholesale.

I therefore reach the following conclusions of law:

1. The proper basis of appraisement for the merchandise covered by the appeals for reappraisement listed on the attached Schedule A is United States value as defined in section 402(c) of the Tariff Act of 1930, as amended.

2. Said value is the appraised value less $2.00 per short ton.

3. The proper basis of appraisement for the merchandise covered by the appeals for reappraisement set out on the attached Schedule B is export value as defined in section 402(b) of the Tariff Act of 1930, as amended.

4. Plaintiff has failed to prove export values other than the appraised values.

5. The correct values of the merchandise imported in the latter period are those found by the district director.

Judgment will be entered accordingly.

(R.D. 11768)

Picker Corporation et al. v. United States

(Decided April 25, 1972)

*Arthur & Hadden* (*Robert E. Glaser* of counsel) for the plaintiffs.
*L. Patrick Gray III*, Assistant Attorney General (*James Caffentzis*, trial attorney), for the defendant.

LANDIS, Judge: These seven appeals for reappraisement, consolidated for trial, raise issue under section 402 of the Tariff Act of 1930, as amended (19 U.S.C.A., section 1401a), as to the valuation of X-ray equipment exported from Denmark during the period December 21, 1968 to February 10, 1970.

The equipment was manufactured and exported by Picker-Andrex X-ray A/S, Copenhagen, Denmark, a solely owned subsidiary of one of the plaintiffs in this case, namely, Picker Corporation, Cleveland, Ohio. Picker Corporation apparently imported the equipment and caused the equipment to be entered at Cleveland for its account using various styles of the "Picker" name for the convenience the names offered in identifying the division of the corporation "that prepares and maintains industrial X-ray equipment".[1]

Section 402, *supra*, provides that all merchandise, imported into the United States shall be valued preferably on the basis of export value; if export value cannot be satisfactorily determined then on the basis of United States value, and if neither of those values can be satisfactorily determined, then on basis of a constructed value. Customs appraised the equipment imported in this case on the basis of constructed value.[2] That basis is presumed to be correct, 28 U.S.C.A., section 2633.

Plaintiffs seek to overcome the presumption upon claim and proof that the X-ray equipment should be valued on export value basis, at the entered invoice prices. Since export value is the preferred basis for valuation under section 402, the only question open to dispute is whether the proofs establish the statutory elements of export value. *Inter-Maritime Forwarding Co., Inc.* v. *United States*, 59 CCPA 84, C.A.D. 1044 (1972); *National Carloading Corporation* v. *United States*, 57 Cust. Ct. 758, 760, A.R.D. 215 (1966); *Mannesmann-Meer, Inc.* v. *United States*, 57 Cust. Ct. 697, 698, R.D. 11243 (1966), affirmed

---

[1] The shipments were imported variously in the name of Picker, Picker Repair, or Picker X-Ray Manufacturing Co., for the account of one or the other of the named importers. The latter two, however, according to a Picker executive, are not "legal" entities.

[2] Constructed value, as defined in section 402(d), as amended, is the sum of:

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, stacked ready for shipment to the United States.

on review, 62 Cust. Ct. 1023, A.R.D. 253 (1969), affirmed on appeal 58 CCPA 6, C.A.D. 995 (1970).

The statutory elements of export value are set forth in the definition of that value in section 402(b), as follows:

> EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

The statutory elements, which I deem dispositive of this case, are further defined in section 402(f), as follows:

> (1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
>     (A) to all purchasers at wholesale, or
>     (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
> without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

> (2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

> (3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

\*     \*     \*     \*     \*     \*     \*

The record in proof of how the appraised X-ray equipment was freely sold and the prices at which it was freely sold *for export to the United States, Pacific Wood Products Company et al.* v. *United States*, 49 Cust. Ct. 460, Reap. Dec. 10377 (1962); *Ziel & Co., Inc.* v. *United States*, 49 Cust. Ct. 454, Reap. Dec. 10374 (1962), consists of the testi-

mony of two witnesses called by plaintiffs and five exhibits introduced by the parties. The witnesses are Mr. William G. Langston, secretary and general counsel of Picker Corporation, and Mr. Walter L. Seibyl, marketing manager of Picker Industrial, U.S., the sales division of Picker Corporation. The three exhibits offered by plaintiff are joint affidavits of Bent Nielsen, production manager, and Eyvind Laursen, controller, of Picker-Andrex (exhibit 1, with attached price lists and exhibit 3) ; and a photocopy of a document which Picker-Andrex management gave to Mr. Langston, with the representation that it was "the net pricing schedule they use[d] in their daily operations in the preparation of invoices". (Exhibit 2.)

Defendant's two exhibits (exhibits A and B) are letters of correspondence sent to Customs at Cleveland, Ohio, under the signature of Mr. Walter L. Seibyl.

Plaintiff's proof in chief is the joint affidavit (exhibit 1) in which Mr. Neilsen and Mr. Laursen state:

1. That they know the facts set forth in this affidavit of their own personal knowledge.

2. That [Picker-]ANDREX is a manufacturer of X-ray equipment, accessories and parts and is located in Denmark.

3. That [Picker-]ANDREX sells its products throughout the world and that it sells through distributors in various countries of the world.

4. That attached hereto and incorporated herein as exhibit A is a complete and accurate copy of price list N 66390, August 1966, which was the price list for [Picker-]ANDREX X-ray equipment and accessories for sale for export to the United States of America and Canada from its date until July 1, 1969, and that all sales of X-ray equipment and accessories made by [Picker-]ANDREX for export to the United States during the period August 1966–July 1, 1969, were made at the prices set forth in such price list.

5. * * *

6. That attached hereto as exhibit C is a complete and accurate copy of price list B 69108, July 1969, which is the price list for [Picker-]ANDREX X-ray equipment, and as exhibit C–1 a complete and accurate copy of price list A 69101, May 1969, which is the price list for [Picker-]ANDREX accessories, both such lists for sale for export to the United States of America and Canada from July 1, 1969, and May 1, 1969, respectively, which are the price lists still in full force and effect and that all sales of X-ray equipment and accessories made by [Picker-]ANDREX for export to the United States during the period July 1, 1969, and May 1, 1969, respectively, through the date of this affidavit were made at the prices set forth in such price lists.

7. * * *

8. * * *

9. * * *

10. That the prices set forth in all such price lists are the prices charged for the respective models, accessories, supplies and parts when sold in any quantity to distributors of [Picker-]ANDREX covered by such price lists and that [Picker-]ANDREX does not give quantity discounts.

11. That the respective models, accessories, supplies and parts set forth in all the exhibits hereto are identical physical characteristics.

12. That the prices set forth in all price lists attached hereto include all expenses incidental to placing the X-ray equipment, accessories, supplies and parts in condition, packed ready for export shipment.

13. That all of sales of [Picker-]ANDREX during 1968, 1969 and 1970 have been made in the usual and ordinary conduct of its business.

14. That the prices set forth on all the attached price lists are prices which are available to all distributors in the areas covered by such price lists and that such price lists are freely circulated to distributors of [Picker-]ANDREX in such areas, which distributors determine the sales price to customers in their individual countries after import has taken place in such countries.

15. That [Picker-]ANDREX imposes no restrictions upon the ultimate use or disposition of X-ray equipment, accessories, supplies or parts sold by it, except for those restrictions imposed upon [Picker-]ANDREX by the Act of the United States of America.

16. That the trade conditions, practices and procedures under which [Picker-]ANDREX markets its products are the same as those confronting other manufacturers of similar merchandise.

17. That the gross price set forth on all price lists for EFTA countries is and was during the relevant periods available to all purchasers and that the "net" price or 20% discount price set forth in all attached price lists for EFTA countries is and was available to all distributors of [Picker-]ANDREX in such countries.[3]

Mr. Langston testified that Picker-Andrex, the manufacturer of the imported X-ray equipment and, since 1968, the wholly owned subsidiary of Picker Corporation, is operated very largely as an independent company by the same people who managed the company prior to its acquisition by Picker Corporation. He stated that Picker-Andrex keeps its own books, establishes its own profit margins, and the compensation of its management is based upon the so-called profit center which they manage.

Relevant to the price lists attached to exhibit 1, Mr. Langston testified that in the pursuance of his legal responsibilities to oversee the

---

[3] Paragraphs 5, 7, 8, and 9 incorporate statements relevant to sales and price lists of X-ray equipment for export to countries other than the United States and Canada.

legal affairs of Picker companies, he visited Picker-Andrex in Copenhagen to review its pricing practices so as to better evaluate the customs appraisement in this case and "certain exposures" under the Internal Revenue Code. From what he saw in the Picker-Andrex records and certain comparisons he made, "which were not exhaustive but merely an effort to determine in general", Mr. Langston said that "the prices charged [by Picker-Andrex] before the acquisition [by Picker Corporation] continued unchanged after acquisition." According to Mr. Langston, Picker-Andrex not only manufactures its X-ray equipment for export but for sale to end users in Denmark.

On cross-examination, Mr. Langston testified as follows:

Q. You have stated Picker-Andrex sells to the United States, is that correct?—A. I did.

Q. And they sell to Picker Corp.?—A. They do.

Q. Prior to the acquisition of the Andreasen firm was Picker Corp. the only purchaser in the United States?—A. No.

Q. How do you know that?—A. From the records of the company which are in my custody.

Q. That would be from the records of the Andreasen firm?—A. From the records of Picker in the United States.

Q. The question was was Picker the only purchaser of Andreasen, do you know?—A. The answer is no.

Q. Andreasen sold to other people in the United States?—A. That's right.

Mr. Seibyl testified that Picker-Andrex determines and makes up the price list for its X-ray equipment and treats Picker Corporation the same as any other wholesaler around the world. He stated that Picker Corporation purchases X-ray equipment on the basis of the price list it gets from Picker-Andrex. Picker-Andrex, according to Mr. Seibyl, markets its X-ray equipment everywhere through an international marketing organization, except in the United States which is Mr. Seibyl's responsibility. Picker-Andrex, he said, also sells to wholesalers in other countries of the world, and "[s]ome of * * * [the] wholesalers are related companies from the standpoint of ownership and some are not".

Mr. Seibyl further testified that at the time he wrote the letter to Customs (exhibit A), stating that "Picker U.S. receives a special intracompany price from Picker-Andrex" and that "Picker-Andrex does not sell * * * [X-ray] equipment to unrelated purchasers in the United States but only sells through the Picker Industrial domestic organization", he had not verified the information with Picker-Andrex and assumed, from a confused reply he received from Picker-Andrex, that Picker Corporation indeed received a special price. He explained that based on the information disclosed in the affidavit (exhibit 1) and a communication he received from Picker-Andrex as to what is actually

charged to other countries, his statement that Picker Corporation gets a "special intra-company price" is not true. Mr. Seibyl also stated that his information as to a Picker-Andrex discount given dealers off of the price list he furnished Customs (exhibit B) came from the affidavit (exhibit 1) prepared pursuant to inquiries he made "when * * * faced with this situation about * * * the trial coming up, and so forth."

I evaluate the above record to be weak, not only for what it says, but for what it does not say. Upon this record, I am inclined to give little weight to the testimony of Mr. Langston and Mr. Seibyl. The fact that the time and manner in which they became informed of the matters to which they testified postdated the time when the merchandise was exported; the generalities to which they testified, and Mr. Seibyl's assumption as to a "special intra-company price" all lead me to conclude that, albeit Picker-Andrex was a subsidiary of their parent corporation, they knew exceedingly little concerning the manner in which and the prices at which Picker-Andrex, at the times of exportation, freely sold or offered the X-ray equipment for export to the United States.

The remaining evidence, viz: the affidavit (exhibit 1), in my opinion fails to factually estabish either of the statutory elements upon which I must weigh the prices at which the X-ray equipment was "freely sold or, in the absence of sales, offered for sale" for export to the United States in the meaning of those relevant terms as defined in section 402 (f), *supra*.

As plaintiffs would have it, "[t]he evidence establishes without contradiction that the prices at which the imported merchandise was sold and invoiced to the plaintiff are in fact the prices at which purchasers at wholesale in the United States and Canada may purchase the same X-ray equipment, parts, accessories and supplies" and "[e]ven if it be urged that the imported merchandise was only sold to selected purchasers at wholesale in the United States, the evidence establishes that the prices at which it was sold clearly reflect the market value of the merchandise." The rub is that the court cannot find prices deemed consistent with market value, unless all purchasers at wholesale are offered an opportunity to buy at those prices. *United States v. Aceto Chemical Co., Inc.*, 51 Cust. Ct. 507, A.R.D. 159 (1963), affirmed on appeal, 51 CCPA 121, C.A.D. 846 (1964). The troubled sense of plaintiff's argument manifests the inadequacy of the affidavit. The fact that "all sales of X-ray equipment and accessories made by ANDREX for export to the United States during the period * * * [August 1966–May 1, 1969] were made at the prices set forth" in the price lists attached to the affidavit (exhibit 1, paragraphs 4 and 6)

does not establish how the merchandise was "freely sold", i.e. to all purchasers at wholesale, or in the ordinary course of trade to one or more selected purchasers at wholesale. The price paid for merchandise, standing alone, is insufficient to establish the export value of the merchandise, as that value is defined in section 402(b) of the Tariff Act of 1930, *supra*. "Prices shown by actual sales are to be disregarded when they are not those at which the merchandise is freely sold to all purchasers at wholesale." *Agricolas de Mexico, S. de R. L. de C. V.* v. *United States*, 66 Cust. Ct. 612, 618, A.R.D. 285 (1971). The affidavit states that all sales were made at the prices set forth in the price lists but it does not state that the X-ray equipment was freely sold or offered for sale to all purchasers at wholesale at those prices.[4]

Even if, at the times of exportation, all of Picker-Andrex sales were to the parent Picker Corporation, the fact that a seller during a particular period, sells to only one purchaser does not in and of itself make that one purchaser a selected purchaser. *H. M. Young Associates, Inc.* v. *United States*, 60 Cust. Ct. 842, 850, R.D. 11517 (1968). Selected purchasers at wholesale are those designated and selected by the seller, that is those to whom the seller restricts its sales, to the exclusion of all other purchasers at wholesale. *Aceto Chemical Co., Inc.*, v. *United States*, 51 CCPA 121, 127, C.A.D. 846 (1964). I find no creditable proof that sales for export to the United States were restricted to selected purchasers. Establishing the statutory manner in which merchandise is "freely sold or, in the absence of sales, offered for sale" does not pose any great problem of proof, *Mannesmann-Meer, Inc.* v. *United States, supra*. Before the court can find a value for merchandise on export value basis under section 402(b), it is mandatory that the record establish that the merchandise, at the times of exportation, was freely sold or, in the absence of sales, offered for sale for export to the United States either to all purchasers at wholesale, or in the ordinary course of trade to one or more selected purchasers. In the absence of such proof, I find no viable basis upon which to weigh the price lists in evidence.

Upon this record, for the reasons stated, I am unable to find how the merchandise was freely sold or offered for sale for export to the United States. Since there is no evidence of United States value, the appraised values constructed under section 402(d) are sustained. *C. J. Tower & Sons of Buffalo, Inc.* v. *United States*, 56 Cust. Ct. 653, 665, R.D. 11152 (1966).

---

[4] The special Customs invoice attached to the official entry papers in R70/3295 recites [section V, 4(B)(2)] that the prices are not freely offered to anyone who wishes to buy the goods for export to the United States.

I find as facts:

1. The involved merchandise consists of X-ray equipment, exported by Picker-Andrex X-Ray A/S of Copenhagen, Denmark during the period from December 21, 1968 to and including February 10, 1970.

2. The merchandise, which does not appear on the Final List (T.D. 54521), was appraised on the basis of constructed value, as defined in section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

3. The evidence does not establish that the invoice unit prices herein are the prices at which, at the time of exportation, such or similar merchandise was sold or, in the absence of sales, offered either (A) to all purchasers at wholesale, or (B) in the ordinary course of trade to one or more selected purchasers at wholesale at prices which fairly reflected the market value of the merchandise, in the ordinary course of trade, for exportation to the United States, within the meaning of section 402(b) and section 402(f)(1)(A) or (B).

I conclude, as law:

1. Plaintiffs have failed to overcome the statutory presumption of correctness attaching to the appraised values.

2. Constructed value, as defined in section 402(d), as amended, *supra*, is the proper basis for determination of the values of the involved merchandise in these appeals for reappraisement.

3. Said values are the appraised values.

Judgment will be entered accordingly.