(C.D. 4557)

C. S. EMERY & COMPANY, INC. v. UNITED STATES

Court No. R67/913

(Decided August 27, 1974)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Irving Levine* of counsel) for the plaintiff.
*Carla A. Hills,* Assistant Attorney General (*James Caffentzis,* trial attorney), for the defendant.

RE, Judge: In this appeal for reappraisement the merchandise consists of two-inch thick sawn slabs of black granite exported from

Canada on July 30, 1964 and entered at the border port of Derby Line, Vermont. The granite was shipped by truck from Alma, Quebec by the seller, National Granite, Ltd. (National) to the John Swenson Granite Co., Inc. (Swenson) at Concord, New Hampshire.

The customs and commercial invoices disclose that the granite was sold to Swenson at a delivered price ("FOB Concord N.H.") of U.S. $3.35 per square foot, including duties. It was entered at an invoiced unit value of U.S. $2.10 per square foot (selling price less claimed nondutiable charges of 97 cents per square foot for bracing and transportation, and 28 cents per square foot for duty and brokerage fees).

The merchandise was appraised on the basis of export value as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at U.S. $3.015 per square foot, net packed. According to the testimony of the appraiser, the appraised value was calculated by deducting 28 cents for duty and brokerage, and then deducting the freight charges within the United States from the border (Derby Line) to Barre, Vermont.

Plaintiff agrees that export value, section 402(b) *supra*, is the correct basis of appraisement, but contends that U.S. $2.10 per square foot, the alleged ex-quarry price of the granite slabs, represents the correct dutiable value. Plaintiff urges, alternatively, that if the appraiser's method of determining value is upheld, he should have made a larger allowance for duty, i.e., 36.416¼ cents which, with the uncontested deductions for brokerage and freight, would result in a dutiable value of U.S. $2.91⅓ per square foot, net packed.

The record consists of the official papers, the testimony of two witnesses called by plaintiff, and four exhibits also submitted by plaintiff.

Mr. Paul Robitaille, president and general manager of National, who supervised production, administration and sales, testified that National produces rough, semifinished and finished granite mainly for building work; that the imported granite came from a quarry located about 25 miles from its office in Alma, Quebec; and that the shipment herein was delivered pursuant to a contract (exhibit 1) with Swenson for the sale of granite slabs and blocks to be used in construction of a building in New York City. National used its own trucks and braces to transport most of the merchandise to Concord. Swenson, which has finishing facilities in Concord, New Hampshire, put the finish on the rough sawn slabs and cut them to size, ready for installation in the building then under construction.

The contract, which is dated March 21, 1963, in relevant part, provided that National "deliver sufficient wire sawed slabs so that Swenson may fabricate therefrom * * * approximately 190,000 net square feet of 2 inch thick stones * * *." Delivery of the two-inch slabs was to

commence on or about February 20, 1963 in quantities of "approximately 5,000 net square feet of 2 inch slabs each week until completion." Deliveries, Mr. Robitaille testified, commenced early in 1963 and ended about two years later.

The agreement called for payment of U.S. $3.35 per net square foot for two-inch slabs "delivered to and accepted by Swenson" with the proviso that—

> "(8) The prices for slabs set forth in paragraph (7) include the costs of delivery to Swenson at its plants in Concord, New Hampshire. If Swenson shall direct delivery of slabs to other fabricating plants in New England, the prices shall be adjusted to reflect any increase or decrease in the cost to National of delivery. * * *"

The contract provided that National could bill Swenson at the rate of $2.50 per square foot for any slabs in stock it had on hand at the end of any month. It also provided that in the event Swenson terminated the agreement for any cause except breach or default by National, Swenson would pay $2.50 per square foot for all slabs produced by National and in stock in Canada.

Mr. Robitaille, who had participated in the contract negotiations with Swenson, said that National "tried to arrive at a higher price, of course, and we came to this final price" of $3.35 per square foot. He had estimated that National would make a profit on the $3.35 price by figuring on 50 cents per foot for material, $1.50 for labor and 25 cents for depreciation and profit, which came to $2.25 in Canadian currency and $2.10 in United States currency. He then arrived at the $3.35 figure by adding 97 cents to cover the cost of bracing and transportation down to Swenson's plant, and 28 cents for duty and brokerage fees.

Mr. Robitaille testified that bracing was necessary to protect the brittle granite slabs against breakage during shipment. He admitted, on cross-examination, that in establishing a "cost of the price for the Swenson order, I took into consideration the volume of the job and the size of the stone."

The witness "would" have sold the merchandise ex-quarry to Swenson at a price of U.S. $2.10 per square foot. However, since the slabs were brittle and subject to excessive breakage if hauled by inexperienced people, Swenson wanted a delivered price so that National would be responsible for breakage.

Mr. Robitaille testified that, during the 1963–1965 period that National was delivering granite to Swenson, it had quoted a price of $2.25 per square foot, Canadian Currency, f.o.b. its plant to a Canadian firm for black granite slabs similar to those in issue. It produced three invoices (exhibits 2, 3 and 4) for sales in December 1964 and

February 1965 of two-inch black granite slabs at $2.25 per square foot to a firm in Quebec.

The witness was willing to sell the material at the $2.25 price to anybody at that time. But he could "not recall" whether he sold similar slabs to other firms during this period, stating that "[t]hese [Quebec invoices] are the only invoices we found." However, he noted that "[i]t does not mean that we did not sell more." He subsequently stated under cross-examination that he could not recall sales in 1963, but that "[w]e had other customers in 1964, I think," which sales were made "[p]robably by written orders."

When asked if he had entered into written agreements during 1965 with purchasers other than Swenson for the sale of two-inch granite slabs, Mr. Robitaille replied "[p]ossibly, but I do not recall either." Upon further questioning, he agreed that during 1963, 1964 and 1965 he sold to others than Swenson; that the sales were usually in the form of a written order; and that he would keep a copy of the order "[f]or a certain period of time * * *." However, he could not produce any contracts or memoranda of the sales made during this period.

The witness explained that it was not possible to have price lists, and that National seldom gave standard prices because they "vary with the type of granite, the finishes, the thicknesses, and the work involved in the stone."

Mr. Robitaille stated that the provision in the Swenson contract for payment of $2.50 per net square foot, for all undelivered slabs National had on hand at the end of the month, covered storage costs. It was also intended to assist National financially since its plant had burned down and the machinery had to be rebuilt. The provision for payment of $2.50 per net square foot, in the event of Swenson's default, for all slabs on hand was intended as compensation to National for spending "so much money to build machinery and equip a plant."

Mr. William L. Thornton, the district director at St. Albans, Vermont, testified he had personally appraised the shipments of granite, including the one at bar, imported under the Swenson contract. The appraised value was arrived at as follows:

> "They started off at $3.35, and the information I had at the time was that the brokerage and duty amounted to 28¢, and the difference between the two nets would be the inland freight. I allowed the freight only within the United States."

Although the entry papers show that the merchandise went to Concord, New Hampshire, Mr. Thornton deducted the prorated freight charge between Derby Line, Vermont and Barre, Vermont, stating that "a lot of them [shipments to Swenson] stopped off in Barre." He made the same deduction in all of the granite shipments from National.

The witness stated that he had customs agents make inquiries as to how National sold the granite. Since no information was available, that it sold at ex-quarry prices, he used the delivered sales price of $3.35 in making the appraisements.

As to its first cause of action, plaintiff contends that under the export value formula it has established that the proper dutiable value for the imported granite is U.S. $2.10 per square foot ($2.25 per square foot, Canadian currency).

Export value is defined in section 402(b), as amended, *supra*, as follows:

"(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States."

The phrase "freely sold or, in the absence of sales, offered for sale," in section 402(f)(1), Tariff Act of 1930, as amended, insofar as pertinent herein, means sold or, in the absence of sales, offered:

"(A) to all purchasers at wholesale, or

\*        \*        \*        \*        \*        \*        \*

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale."

The appraiser's finding of value carries a statutory presumption of correctness (28 U.S.C. § 2633, superseded by 28 U.S.C § 2635 by the Customs Courts Act of 1970, Pub. L. 91–271). It was, therefore, incumbent upon plaintiff to establish, by competent satisfactory evidence, that the appraised value was erroneous, and that such or similar merchandise was freely sold or, in the absence of sales, offered for sale to all purchasers at wholesale in the principal markets of Canada in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States at the alleged ex-quarry price of U.S. $2.10, or $2.25, Canadian currency.

The record does not contain the required proof, and the presumption of correctness has not been rebutted. There is no evidence that such or similar merchandise was actually sold or ever offered

for sale for export to the United States at an ex-quarry price during the period in issue. Although Mr. Robitaille stated that National "would" have accepted an ex-quarry price of U.S. $2.10 from Swenson or "anybody," he never testified that National actually sold two-inch granite slabs for export to the United States at such price during the period in issue; nor was he able to recollect the price quoted on slabs at that time.

It is proper to note the witness' admission that similar granite slabs were sold for export to the United States in 1964 and 1965 and his failure to produce any documents relating to those transactions. He did, however, have on hand invoices showing sales at an ex-quarry price ($2.25 Canadian currency) to a Canadian firm in those years. Under the circumstances, his unexplained failure to offer evidence of the price at which the sales of granite slabs for export to this country were made warrants an inference unfavorable to plaintiff's claim.

Furthermore, Mr. Robitaille's willingness to sell ex-quarry to Swenson or anybody else does not meet the requirements of export value as defined in the statute. The export value formula addresses itself to the realities of the marketplace, that is, it contemplates a market value that is established by what is *actually* done in terms of sales and offers of sale, not by mere possibilities. Thus it is well settled that neither willingness to sell merchandise at a particular price, nor the fact that it could have been sold at a particular price, is evidence of a price. *United States* v. *Bud Berman Sportswear, Inc.*, 66 Cust. Ct. 628, A.R.D. 287 (1971), *aff'd*, 469 F.2d 1107, 60 CCPA 34, C.A.D. 1077 (1972); *Delmonico International Corp.* v. *United States*, 52 Cust. Ct. 656, A.R.D. 176 (1964). See also *Ontario Stone Corporation* v. *United States*, 319 F. Supp. 923, 65 Cust. Ct. 753, R.D. 11727 (1970).

Finally, evidence of sales made in the home market to a *Canadian* purchaser four and six months after the merchandise at bar was exported has no weight in establishing either the price at which it was freely sold or offered for sale for *export* to the United States or, indeed, what the price was "at the time of exportation" of the subject merchandise, as required by section 402(b) *supra*. See *United States* v. *Robert Reiner, Inc.*, 35 CCPA 50, C.A.D. 370 (1947); *The A. W. Fenton Co., Inc.* v. *United States*, 61 Cust. Ct. 437, R.D. 11556 (1968), *application for review dismissed*, 61 Cust. Ct. 613, A.R.D. 246 (1968); *Sam Yeung Co.* v. *United States*, 52 Cust. Ct. 572, 575, R.D. 10760 (1964).

In the absence of any showing that the merchandise was freely sold for export to the United States to all purchasers at wholesale on an ex-quarry basis, plaintiff must fail on its first claim since it has failed to sustain its burden of proof.

For its alternative claim, plaintiff accepts the appraiser's presumptively correct determination that the export value for the merchandise is the delivered price of U.S. $3.35 per square foot less nondutiable charges consisting of duty, brokerage, and freight charges within the United States. It contends, however, that the customs officer failed to deduct a sufficient amount for the duty.

For purposes of this claim plaintiff relies upon the principle that a party may challenge one or more of the elements entering into an appraisement while relying upon the presumption of correctness of the appraiser's return as to all other elements. *United States* v. *Fritzsche Bros., Inc.*, 35 CCPA 60, C.A.D. 371 (1947) ; *Ontario Stone Corporation* v. *United States*, 319 F. Supp. 923, 65 Cust. Ct. 753, R.D. 11727 (1970) ; *Alvin Naiman Corporation* v. *United States*, 54 Cust. Ct. 705, R.D. 11008 (1965). Where, as here, the appraisement was made by working backward from a delivered price in Concord, New Hampshire to a price at the Canadian border, and there is no dispute as to which charges were deducted, the appraisement is deemed to be separable. *Ontario Stone Corporation* v. *United States, supra; Alvin Naiman Corporation* v. *United States, supra*. Accordingly, plaintiff may challenge the deduction for duty, while relying upon the presumption of correctness attaching to the other elements of the appraisement. *Alvin Naiman Corporation* v. *United States, supra*.

The appraiser had arrived at a value of $3.015 per square foot by deducting 28 cents per square foot for duty and brokerage from $3.35, and deducting an additional 5.5 cents per square foot (the difference between $3.07 and $3.015) for the freight charges from the port of entry, Derby Line, Vermont, to Barre, Vermont. It is not disputed that the allowance of 28 cents includes 1.75 cents for brokerage and 26.25 cents for duty. The duty figure was based on the apparently applicable rate of duty of 12.5 per centum ad valorem [1] upon the entered value of $2.10.

Plaintiff expressly concedes that the amount of duty figured in the delivered duty-paid price of $3.35 was 26.25 cents (based on 12.5 percent of $2.10), and that the special customs invoice states that the "selling price of 3.35 includes * * * .28 per foot for duty and brokerage fees." It claims, nonetheless, that the "included" duty should be based on 12.5 percent of $3.2775, that is, the delivered price of $3.35 less 5.5 cents freight, less 1.75 cents brokerage. This would result,

---

[1] The entry papers disclose that the granite slabs had been entered by the importer and advisorily classified by customs as dutiable at 12.5 per centum ad valorem under TSUS item 513.74, which provides, among others, for articles of granite, sawed, suitable for use as monumental, paving or building stone. It may be noted that merchandise entered prior to the effective date of the Customs Courts Act of 1970, Pub. L. 91–271 is not liquidated until the appraisement becomes final. *New York Merchandise Co., Inc.* v. *United States*, 51 Cust. Ct. 255, Abs. 68111 (1963). Hence, the subject importation, which is before the court on an appeal for reappraisement, has only been "advisorily" classified.

according to plaintiff's calculations, in a deduction of 36.4161¼ cents per square foot for duty, leaving a dutiable value of $2.911⅓ per square foot, United States currency, net packed.

Plaintiff argues that "[s]ince this figure [$3.2775] includes 12.5% duty, when divided by 112.5%, the result is equal to the dutiable value less included duty at 12.5%."

Plaintiff is in error as to the nature of the deductions allowed under the export value statute. The value contemplated under section 402(b), as amended, is the *per se* price of the goods in the principal markets of the country of exportation, plus the cost of packing and other expenses incidental to placing the goods in condition for shipment. Thus, charges accruing subsequent to the time of shipment are not ordinarily included in dutiable export value and, where the goods, as here, are sold at a c.i.f. duty-paid price, the duty may not be included. *Josef Mfg., Ltd.* v. *United States*, 294 F. Supp. 956, 62 Cust. Ct. 763, R.D. 11616 (1969), *aff'd*, 314 F. Supp. 51, 64 Cust. Ct. 865, A.R.D. 274 (1970), *aff'd*, 460 F.2d 1079, 59 CCPA 146, C.A.D. 1057 (1972); *The A. W. Fenton Co., Inc.* v. *United States, supra.* Accordingly, only the actual duties which comprised part of the selling price are deductible.

It is clear from the foregoing that the amount claimed by plaintiff is unrealistic and, if allowed, would result in a dutiable value that bears no relationship to the actual transaction. On the other hand, Mr. Thornton's allowance of 26.25 cents, which equals the actual amount included for duties in the $3.35 price, comports with the statutory requirements and was entirely proper. Therefore, plaintiff has failed to establish its alternative claim.

The court also considered plaintiff's contention that the appraisement herein is erroneous because Mr. Thornton testified to making the same deductions in appraising all of the shipments of two-inch granite slabs delivered under the Swenson contract, although some importations, including the instant one, went to Concord, New Hampshire and the others went to Barre, Vermont.

Plaintiff relies, in its argument, upon *United States* v. *Josef Mfg., Ltd.*, 460 F.2d 1079, 59 CCPA 146, C.A.D. 1057 (1972). The *Josef* case dealt with two shipments of dresses imported from Canada at Champlain, New York, one of which was destined for Florida, and the other for Illinois. Both shipments, which were of different weights, had been sold at uniform c.i.f. delivered prices, including all charges, freight and duty. Utilizing export value as the basis of valuation, the appraiser took the uniform c.i.f. prices, deducting in each case the identical freight charge from Montreal to New York. This, however, did not represent the actual freight paid in either shipment, since, because of the different destinations, each freight charge differed.

The appellate court agreed with the holding of the trial judge that the freight deductions were erroneous because they did not represent

the actual freight charges, and that uniform c.i.f. prices, which included freight charges that were variable depending upon the location of the customer, could not be used as a basis for appraisement because they negated the existence of a single home market price for the merchandise—a prerequisite for a determination of statutory export value. This is explained in the following statement of the court:

"We also agree that the appraiser could not make the exporter's uniform c.i.f. prices usable as the basis for statutory appraisement merely by deducting therefrom the freight from Montreal to the New York border. Even if the appellee did not rebut the presumption of administrative correctness by its witness's somewhat ambiguous testimony that the appraiser's deductions were 'not the actual freight paid on this shipment' and assuming that the actual freight charges for transporting two cartons, one weighing 6 lbs. 3 oz. and one weighing 26 lbs., from Montreal to Champlain, N.Y. were both $7.88, the c.i.f. prices of the two customers involved here still included the costs of shipping the goods from Champlain to Chicago, Ill., and Miami Beach, Fla., respectively. Necessarily that means that the prices of the goods per se were not the same to the two customers, or to various other customers in various other parts of the United States. Accordingly, there was no uniform price for the imported *goods*, as distinguished from a uniform price for the package consisting of the goods, the freight, and the insurance, and no individual price, or average price, will substitute for such a uniform price under the statutory scheme. * * *" (Emphasis in original.) 59 CCPA at 150.

The *Josef* case differs markedly in its factual aspects from that at bar. There is only one shipment in this case, and, while Mr. Thornton testified to making identical deductions in the other entries of two-inch granite slabs shipped under the Swenson contract, it is not clear from his statements that the c.i.f. delivered price was the same in all shipments, regardless of destination. The uncertainty is compounded by the terms of the agreement (exhibit 1) which provide in paragraph 8 that—

"The prices for slabs set forth in paragraph (7) include the costs of delivery to Swenson at its plants in Concord, New Hampshire. If Swenson shall direct delivery of slabs to other fabricating plants in New England, the prices shall be adjusted to reflect any increase or decrease in the cost to National of delivery. * * *"

Thus, under the contract the c.i.f. delivered price would vary in accordance with the differing delivery costs to National if Swenson had the slabs delivered elsewhere than to its plant in Concord, New Hampshire. There is no indication in the record that a price adjustment was not so made to reflect the differing delivery cost, if any, to National when the merchandise was shipped to Barre, Vermont, or that the appraiser did not use the adjusted c.i.f. prices in appraising those ship-

ments. Therefore, in the absence of competent evidence that the goods were sold at a uniform c.i.f. price regardless of the place of delivery, the holding in the *Josef* case, as to the nonexistence of a single home market price, is not applicable.

The appraiser's error, if any, lies in deducting the freight charges from Derby Line, Vermont to Barre, Vermont rather than to Concord, New Hampshire, the place of delivery. While delivery charges often vary according to destination, in this record there is not a scintilla of evidence as to the actual difference in the cost to National of trucking the merchandise either to one place or the other, or that it was more than *de minimis*. In the absence of testimony as to terrain, location, available highway routes and other essential data, the court cannot make appropriate findings.

Furthermore, having specifically adopted the appraiser's return, plaintiff has not challenged the amount deducted for freight. Therefore, as plaintiff has failed to meet its dual burden of establishing error in the appraisement, and the correctness of its claimed value, the appraisement must stand. *Minkap of California, Inc.* v. *United States*, 55 CCPA 1, C.A.D. 926 (1967); *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593 (1955).

In view of the foregoing, the appraised value is affirmed.

Judgment will be entered accordingly.