**SANFORD STEEL PIPE PRODUCTS CO.**

v.

**UNITED STATES.**

**C.D. 4567; Court No. R68/6142–16445.**

United States Customs Court.
Nov. 15, 1974.

---

Allerton deC. Tompkins, Staten Island, N.Y., for plaintiff.

Carla A. Hills, Asst. Atty. Gen. (James Caffentzis, New York City, trial atty.), for defendant.

MALETZ, Judge:

This action concerns the correct dutiable value of certain unfinished welding fittings that were exported from West Germany in April 1967 by the manufacturer, H. Siekmann & Co., Bunde (Westf), West Germany, and entered by the plaintiff-importer at the port of Chicago in June 1967.

The merchandise was appraised by the government on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a(b)). In making the appraisement, the government rejected the invoice prices as representing export value and adopted higher values. Plaintiff, while agreeing that export value is the proper basis of appraisement, insists that such value is represented by the invoice prices, i. e., the c. i. f. prices, less a pro-rated amount for ocean freight, seaway tolls and marine insurance. Thus, the issue is whether plaintiff has established by a preponderance of the evidence that its claimed values represent the proper export value for the merchandise in issue.

The pertinent provisions of section 402 of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a) are as follows:

(b) *Export Value.*—For the purposes of this section, the export value

of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \*

(f) *Definitions.*—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

At the outset, it is undisputed that the merchandise is not on the final list; that the quantities herein ordered for the merchandise in question (carload lots) were the "usual wholesale quantities"; that the principal market in West Germany for the sale of such or similar merchandise for export value purposes was in Bunde (Westf), West Germany; and that there was no corporate or family relationship between the importer and exporter. Beyond that, the following additional facts were established by the record:[1] During the years 1966 and 1967, plaintiff was the only United States buyer of unfinished welding fittings from the exporter, Siekmann. However, there was no exclusive agreement of any kind between Siekmann and the plaintiff and thus plaintiff was not a selected purchaser within the meaning of section 402(f)(1)(B).[2] Sales made by Siekmann to plaintiff were without restrictions of any kind as to the disposition or use of the merchandise by the latter. The prices shown on the invoices were, with one exception, the actual purchase prices.[3] Further, the importations in issue were shipped in partial fulfillment of an order placed by plaintiff on November 4, 1966 and accepted by Siekmann on November 21, 1966. In this circumstance,

---

[1]. The record consists of the testimony of Sanford Takiff, general manager of plaintiff; an affidavit of Edwin Klein, sales manager of the exporter, Siekmann, that was executed in 1970; and a certified report of a customs representative relating to an interview he had in 1966 with Klein and the export manager of Siekmann. It is to be observed that 28 U.S.C. § 2635(b) (1970) provides in part that where the value of merchandise is in issue, reports of customs officers and affidavits of other persons whose attendance cannot reasonably be had, may be admitted in evidence when served upon the opposing party in accordance with the rules of the court.

[2]. A selected purchaser situation within the meaning of section 402(f)(1)(B) results when a seller restricts his sales to one or more specifically designated purchasers. See e. g., Aceto Chemical Co., Inc. v. United States, 51 CCPA 121, 127, C.A.D. 846 (1964); C. H. Powell Co., Inc. v. United States, 67 Cust.Ct. 493, 498, n. 3, R.D. 11752 (1971), aff'd, 69 Cust.Ct. 257, A.R.D. 307 (1972).

[3]. The exception is that the invoices showed that the pro-rated amount for costs incurred for ocean freight, seaway tolls and marine insurance totaled DM 5,070.95, while plaintiff's proof established that the total costs for these claimed deductions totaled DM 4,-491.91.

the present controversy involves a single sale made by Siekmann to plaintiff.

■■ In order to establish that the prices at which Siekmann made this single sale constituted the export value for the merchandise, plaintiff was required to prove that the merchandise was freely offered for sale at such prices to all purchasers at wholesale for exportation to the United States. United States v. Malhame & Co., 19 CCPA 164, 171, T.D. 45276 (1931); United States v. Manahan Chemical Co., Inc., 24 CCPA 53, 62, T.D. 48333 (1936); Graves v. United States, 61 Cust.Ct. 580, 583, A.R.D. 242, 287 F.Supp. 611, 614 (1968). Against this background, the record contains no proof whatever as to how merchandise such as that in issue was offered to other purchasers at wholesale at the time of exportation to the United States. Ordinarily, a freely offered price can be established by the existence of a manufacturer's price list freely circulated to the trade. See Judson Sheldon International Corporation v. United States, 51 Cust.Ct. 374, 378, R.D. 10586 (1963), aff'd, 54 Cust.Ct. 773, A.R.D. 183 (1965). However, the testimony of Mr. Takiff, plaintiff's general manager, was to the effect that Siekmann did not issue a price list for unfinished fittings.

In the absence of a price list, numerous other avenues are available to a party to prove a freely offered price, such as prices contained in catalogues and letters, telegrams, etc. from the manufacturer to potential buyers. No such evidence was presented at the trial of this case.

Indeed, far from establishing a freely offered price by the exporter, the testimony of Takiff makes clear that *plaintiff* initiated the transaction in issue by offering to buy the fittings at particular prices. Thus, Takiff testified that plaintiff began doing business with Siekmann in 1965 when it wrote Siekmann offering to purchase unfinished fittings at specified prices.[4] Siekmann accepted the offer and a contract ensued. In the latter part of the following year, 1966, plaintiff made a further offer to purchase from Siekmann the fittings here in issue at the same prices that had been agreed upon in 1965. Takiff testified that because of the size of the order, he knew that plaintiff's offer would be accepted by Siekmann—as it was.[5] In sum, the offer involved in this case was to purchase—not to sell. And on this score, the record fails to show that there was any mechanism whereby any potential purchaser could inform itself as to the selling price agreed upon between plaintiff and Siekmann. In fact, for all that appears in the record, it would seem that other United States purchasers would have to make their own offers to Siekmann in order to buy unfinished fittings such as those involved here, and that Siekmann could then accept an offer or make a counter-offer.

In addition to Takiff's testimony, there is another piece of evidence which militates against a finding that plaintiff's prices represent the export value for the involved merchandise. This evidence is contained in a customs representative's report dated August 3, 1966 setting forth information furnished to him jointly by two officials of Siekmann in the course of an interview on May 9, 1966. This report states that these two officials—one of whom was Edwin

---

4. According to Takiff, plaintiff arrived at its offering prices to Siekmann in 1965 in the following manner: First, plaintiff asked particular customers at what prices they would buy certain types of unfinished fittings from plaintiff. These customers in turn indicated that they could obtain the fittings from plaintiff's competitors at specified prices, and that if plaintiff could meet those prices, it would get the business. Plaintiff then deducted from those prices the duty, interest, and its profit and came up with c.i.f. prices, which prices then became its offering prices to Siekmann.

5. It is to be noted that with respect to the importations in question, plaintiff was accorded a trade discount of three percent on so-called long radius fittings and five percent on short radius fittings. Takiff, however, was unable to recall why Siekmann allowed these discounts.

Klein, Siekmann's general manager, and the other, Siekmann's export manager— provided the following information:

> Siekmann prices depend upon bargaining. Prices are based upon United States manufacturers prices, and depend upon the quantity and quality ordered. Since early in 1964 customers generally stipulate a "limit price" which Siekmann accepts or rejects according to practical business considerations of profit.[6]

The single shred of testimony concerning the manner in which the merchandise in question was offered by Siekmann to other potential buyers in the United States is contained in an affidavit of the aforesaid Edwin Klein that was executed on May 21, 1970.[7] In his affidavit, Klein stated:

> 11. The same terms and prices for the same unfinished welding fittings *are* available to every U.S. buyer buying in large wholesale quantities, such as the quantities purchased by Sanford. [Emphasis added.]

■■ The weight to be given this evidence must be "assessed in practical terms, considering such factors as completeness, adequacy of bases, and possible motives to deceive." Mannesmann-Meer, Inc. v. United States, 58 CCPA 6, 8, C.A.D. 995, 433 F.2d 829, 831 (1970). Measured by this standard, it must be concluded that the foregoing testimony is entitled to little weight. In the first place it is unsupported by any records or

offers to sell. Second, it is inconsistent with the testimony of Takiff which set forth in some detail how the prices on the imports were arrived at. Third, it is at direct variance with the earlier statement Klein gave to the customs representative. And in this latter connection, it is not without significance that Klein's statement to the customs representative was made in May 1966—almost two years before the present action was commenced on March 1, 1968, while his affidavit was executed in May 1970—over two years after the action was started.

■ These considerations aside, since in his 1970 affidavit Klein used the present tense "are," it is impossible to conclude that the prices he referred to were those containing discounts.[8] For paragraph 8 of his affidavit states that from the end of 1968 no discounts were given by Siekmann for unfinished fittings. Moreover, the statement in paragraph 11 of the affidavit is, at best, an indication that Siekmann was willing to sell to others at the same prices it sold to plaintiff. However, the mere willingness to sell at the claimed prices, unaccompanied by price lists or evidence of overt communications with prospective customers, is insufficient to establish that the merchandise was freely offered for sale at such prices to all purchasers at wholesale for exportation to the United States. American Biltrite Rubber Co., Inc., Boston Woven Hose & Rubber Division v. United States, 60 Cust.Ct.

6. Contrary to plaintiff's objections, this report is quite germane to the present litigation. Although the report relates to an interview in 1966—which was prior to the date of exportation—it is relevant to show the manner in which Siekmann established its prices. Time is not a controlling factor since (as previously indicated) Takiff testified that the prices for the merchandise in issue were the same as the prices that plaintiff and Siekmann had agreed upon in 1965. Nor is it of any moment that the report deals with transactions between Siekmann and Iraco, Ltd. rather than transactions between Siekmann and plaintiff—this by reason of the fact that Iraco was plaintiff's "Head Office" in Europe. Moreover, the reference in the report to a so-called "limit price" was corroborated by the testimony of Takiff and was very much a part of the manner in which the prices to plaintiff were arrived at.

7. In the customs representative's report, Klein was identified as the general manager of Siekmann. In his affidavit, however, Klein identified himself as Siekmann's sales manager.

8. As previously observed, Siekmann's prices to plaintiff contained a discount of three percent or five percent depending on whether the fittings were long or short radius ones. See note 5, *supra*.

946, 950, A.R.D. 235 (1968). See also e. g., Transatlantic Shipping Co., Inc. v. United States, 28 CCPA 19, 23–24, C.A. D. 118 (1940); Bluefries New York, Inc. v. United States, 33 Cust.Ct. 501, 506, R.D. 8317 (1954).

From the foregoing, it is held that plaintiff has failed to establish that the prices it paid for the merchandise in question were freely offered to all purchasers at wholesale. The action is therefore dismissed and the appraised values affirmed. Judgment will be entered accordingly.