**MAJESTIC ELECTRONICS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**C.D. 4839; Consolidated Court No. R66/12103.**

United States Customs Court.

Jan. 30, 1980.

Stein, Shostak, Shostak & O'Hara, Inc., Los Angeles, Cal. (John N. Politis, Los Angeles, Cal., at the trial; Theo B. Audett, Los Angeles, Cal., on the briefs), for plaintiff.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Director, Customs Litigation Branch, New York City (Velta A. Melnbrencis, New York City, at the trial and on the briefs), for defendant.

RE, Chief Judge:

In this case, consisting of twenty-seven appeals for reappraisement, the question presented pertains to the correct dutiable value of certain wigs and other products of human hair imported from Italy between 1964 and 1967. The merchandise was manufactured by Italwig S.A.S. of Rome, Italy [Italwig], and was purchased by the plaintiff, Majestic Electronics, Inc. [Majestic], which later changed its name to Brentwood Industries.

Based on the price of "such or similar" merchandise, it was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(b)), at unit values higher than the invoice unit values, as entered.

Plaintiff agrees that export value as defined in section 402(b) of the Tariff Act of 1930, as amended, is the correct basis of appraisement, but contends that the invoice unit values, as entered, represent the correct export value. Plaintiff urges, alternatively, that, if it is determined to be a selected purchaser within the meaning of section 402(f), Tariff Act of 1930, as amended, the invoice unit values represent the prices which fairly reflect the market value of the merchandise.

The question presented, therefore, is whether plaintiff has succeeded in establishing that the invoice unit values, as entered, are the correct export values for the imported merchandise. After careful consideration of the testimony of plaintiff's witnesses and the entire record, it is the determination of the court that plaintiff has failed to bear its burden of proof, and these appeals for reappraisement are therefore dismissed.

At the trial, Mr. Herman Krissman, vice president of Majestic during the period in question, testified as to the facts which pertain to the purchase of the imported merchandise. As vice president of Majestic, Mr. Krissman visited Italy regularly to purchase wigs and other products of human hair. Although he visited approximately ten manufacturers in Italy between 1964 and 1967, and purchased from four companies other than Italwig, the great majority of his purchases were from Italwig. With the exception of the first purchase in December, 1964,[1] none of the merchandise purchased from Italwig was from existing stock but, rather, had to be made to Majestic's specifications. Majestic's first purchase, which was from Italwig's existing stock, was made to provide Italwig with additional working capital.

The price for all purchases by Majestic from Italwig was determined by arm's length negotiation based on the cost of production plus profit. The cost varied and depended upon the quality of the materials used, and whether the article was hand tied or machine made. Hand-tied wigs of Italian hair were the most expensive articles, and machine-made wigs of Oriental hair were the least expensive.

Mr. Giovanni Borghese, general manager of Italwig, negotiated the prices of the merchandise at issue with Mr. Krissman. Mr. Borghese, an Italian citizen who testified in English, described the negotiation process and the manufacturing process. Mr. Borghese corroborated Mr. Krissman's testimony that prices were determined by arm's length bargaining, and that they represented their respective companies in these negotiations. The price for all the merchandise purchased by Majestic, including the first order, was negotiated by the parties. Mr. Borghese testified that he negotiated the price for most sales for exportation to the United States. The degree or amount of negotiation, however, depended on the size of the orders.

Although the defendant introduced an Italwig pricelist, dated June 1, 1966 as defendant's exhibit A, Mr. Borghese stated that he did not have formal printed pricelists. He explained that the pricelists were only for whatever merchandise Italwig had in its showroom at the time. He stated that although some small orders were at list prices, the pricelist was used as a beginning point for the negotiation process. Although the pricelist would change to reflect the models Italwig had in its showroom, it never contained a list of models Italwig would manufacture at stated prices.

Mr. Borghese explained that prices would vary depending on the quality of materials and the construction of the specific article. According to Mr. Borghese, the qualities of

---

1. Entry No. 107666 in Court No. R66/15376. At trial, and in its post-trial briefs, plaintiff mistakenly referred to this entry as entry No. 710666. In plaintiff's reply brief, it is correctly identified as entry No. 107666.

hair varied, and there was a great difference in price among the various types of hair. The price of a wig would also depend upon the color desired since the lighter colors required more processing, and hence were more expensive.

Mr. Borghese also stated that there was a great difference in price between hand-tied and machine-made hair products. The price not only reflected the quality of the product, but also the amount of labor required to complete it. As an illustration, Mr. Krissman testified that although it would take sixteen hours or more for one worker to produce a single hand-tied wig, at least ten wigs could be machine made by one worker in a single day.

The merchandise in issue, purchased by Majestic from Italwig, consists of various models of products of human hair, including wigs, a fall and a wiglet. Mr. Borghese corroborated Mr. Krissman's testimony that, with the exception of Majestic's first order, all articles were specially produced to Majestic's specifications.

Mr. Borghese testified that there were considerable differences between the merchandise Italwig manufactured for Majestic, and that which it manufactured for other customers for export to the United States. The testimony is conflicting as to what merchandise the witness considered "similar" to the merchandise sold to Majestic. On cross-examination, he stated that the articles sold to Majestic were "similar" to items on an Italwig pricelist. He stated that he understood "similar" merchandise to be of the same specifications as to hair quality, color, and construction. He made it clear, however, that although he considered products with the same specifications to be "similar", there was a "very considerable difference" as to the actual product. As an example, Mr. Borghese stated that although the wiglet model sold to Majestic was similar in specifications to one sold to another customer, it was "an entirely different article". The wiglet for Majestic would not be acceptable to Italwig's other customers, and the model for other customers would not be acceptable to Majestic. Mr. Borghese stated that wigs with the same specifications could be "similar" although they would have entirely different values depending on the processing. Mr. Borghese did not testify as to the similarity of merchandise based on the statutory definition of similar merchandise contained in section 402(f) of the Tariff Act of 1930, as amended.

Mr. Borghese also testified that Italwig's prices were generally determined by negotiation on the basis of cost of production. Small orders were generally made at list prices. He stated that the order would have to be beyond a certain quantity before he would negotiate. Although there was no strict rule as to volume determining price, he admitted that prices were lower for volume purchasers.

Except for a small number of missing invoices, which Mr. Borghese could not account for, defendant introduced a complete record of Italwig's sales for the years 1964 to 1967.

Defendant called no witnesses at trial, but introduced two exhibits. Defendant's exhibit A is an Italwig pricelist dated June 1, 1966 and numbered 3, which contains none of the model names of the merchandise in issue. Defendant's exhibit B is a copy of Bureau of Customs foreign agent's report 3–158, dated August 25, 1965. In the report, Customs Representative James A. Amoroso described his visit to the offices of Italwig in Rome, Italy, and his interview with Mr. Borghese on August 20, 1965. Among other things, Mr. Borghese stated that the relationship between Majestic and Italwig was buyer and seller, and that sales were made outright. Mr. Borghese estimated that approximately 75% of Italwig's production was sold to Majestic, and that all sales were made on the basis of bargaining. As one of the exhibits to the report, Mr. Amoroso attached a copy of an Italwig pricelist dated August 2, 1965, which differed from defendant's exhibit A. This list contained prices of three of the models of wigs bought by Majestic. Next to the list price,

Mr. Borghese wrote the price that Majestic paid for the merchandise.[2]

Plaintiff contends that, under the statutory definition of export value, it has established that the invoice unit values, as entered, are the proper dutiable values. In the alternative, plaintiff contends that if it is found to be a selected purchaser, then the invoice unit values, as entered, fairly reflect the market value of such merchandise.

Export value is defined in section 402(b), Tariff Act of 1930, as amended, as follows:

"(b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States."

Section 402 also defines terms used in the statutory definition of export value. The pertinent definitions, found in section 402(f), Tariff Act of 1930, as amended, are as follows:

"(f) DEFINITIONS.—For the purposes of this section—

(1) The term 'freely sold or, in the absence of sales, offered for sale' means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

\*　　\*　　\*　　\*　　\*　　\*

(4) The term 'such or similar merchandise' means merchandise in the first of the following categories in respect of which export value . . . can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

(5) The term 'usual wholesale quantities', in any case in which the merchan-

---

2. Defendant's exhibits A and B were admissible into evidence under the terms of 28 U.S.C. § 2635(b) which provides:

"(b) Where the value of merchandise is in issue:

(1) Reports or depositions of consuls, customs officers, and other officers of the United States and depositions and affidavits of other persons whose attendance cannot reasonably be had, may be admitted in evidence when served upon the opposing party in accordance with the rules of the court.

(2) Price lists and catalogs may be admitted in evidence when duly authenticated, relevant, and material."

dise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity."

■ The statutory presumption of correctness attaching to the appraiser's finding of value requires the plaintiff to establish, by competent satisfactory evidence, that the appraised values were erroneous. (28 U.S.C. § 2633 (1964), superseded by 28 U.S.C. § 2635(a) (1976).) It is also incumbent upon plaintiff to establish that such or similar merchandise was freely sold or, in the absence of sales, offered for sale to all purchasers at wholesale in the principal markets of Italy in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States at the alleged invoice unit values, as entered. *C. S. Emery & Co. v. United States*, 73 Cust.Ct. 84, 88, C.D. 4557 (1974). See also *Andy Mohan, Inc. v. United States*, 396 F.Supp. 1280, 1282, 74 Cust.Ct. 105, 107, *aff'd*, 537 F.2d 516, 63 CCPA 104 (1976).

The first aspect of plaintiff's burden of proof requires that plaintiff overcome the presumption of correctness which attaches to the appraiser's findings of value.

Majestic's first order with Italwig included "Italwigs", 100% Italian hair, hand-made wigs, from Italwig's stock. This item appeared on the Italwig pricelist, defendant's exhibit A, at $60.00 to $90.00 depending on color, for quantities of twenty-five to one hundred, $54.00 to $81.00 for quantities of over one hundred to five hundred, and $49.25 to $64.25 for quantities over five hundred. This item was sold to other customers of Italwig at list prices. It is clear that Customs properly appraised this first order, entered as entry No. 107666.

Majestic's subsequent orders of "Italwigs" were not 100% Italian hair, as in the first order, but were of a mixture of Italian and other human hair to Majestic's specifications. Mr. Borghese testified that the "Italwigs" made to Majestic's specifications were not the same as any other product Italwig manufactured. He also testified that Majestic's "Italwig" differed greatly from other wigs Italwig manufactured. Only the "Italwig" of the first sale appeared on Italwig's pricelist. The appraiser, therefore, was incorrect in appraising the "Italwigs" of mixed hair of the later sales on the basis of the "Italwig" of the first sale.

■ Sales of "B/Italwigs" ("Brentwood Italwigs"), hand tied of 100% human hair, were made by Italwig to customers other than Majestic although they were made to Majestic's specifications. Italwig's invoices for 1965 reveal that there were four shipments of this model to Todd Imports of Portland, Oregon. It is unclear, however, whether each of these shipments constitutes a single order or separate orders. Mr. Borghese's testimony does not reveal, and there is no way of determining, whether a specific invoice represented an order or a shipment. Plaintiff argues that these sales were "small sales", and that the "B/Italwig", hand tied of 100% human hair, was sold in "significant quantities" only to Majestic. If, by this argument plaintiff contends that the sales to Todd Imports were not in "usual wholesale quantities", it has failed to demonstrate what are the "usual wholesale quantities".

The sales to Todd Imports were at the prices listed on Italwig's pricelist attached as an exhibit to the Bureau of Customs foreign agent's report, defendant's exhibit B. This was the price which the appraiser found to be the value of the "B/Italwig" imported by Majestic in the present case.[3] In light of the sales of the "B/Italwig" to Todd Imports at the list price, and in light

---

3. "B/Italwigs" (Brentwood Italwigs), hand-made, were also included in entry No. 107666 covering "Italwigs" which were 100% Italian hair. The "B/Italwigs", as well as various products invoiced to Majestic and other purchasers as "100% human hair", did not consist of "100% Italian hair".

of the pricelist itself, plaintiff has failed to overcome the presumption of correctness attaching to the appraiser's finding of value of the "B/Italwig", hand tied of 100% human hair.

Majestic also purchased from Italwig a "B/Italwig", machine made, 100% human hair. This item was also on the pricelist attached to the Bureau of Customs foreign agent's report. Italwig's invoices, as introduced by plaintiff, reveal only one sale of this item to a purchaser other than Majestic. There was a sale of one machine-made "B/Italwig" to Todd Imports. Whether or not that sale can be considered to be in the "usual wholesale quantity", inclusion of the machine-made "B/Italwig" on the pricelist supports the appraiser's finding of value. The plaintiff has also failed to overcome the presumption of correctness attaching to the appraiser's finding of value as to the "B/Italwig", machine made of 100% human hair.

In addition to the sales to Todd Imports of the "B/Italwig", hand tied and machine made of 100% human hair, sales also were made of the "Italwig", hand tied of 100% Italian hair, to customers other than Majestic based on the pricelist attached to exhibit B. In the absence of sales, the pricelist establishes, therefore, the freely offered price for the specified merchandise.

■ Majestic also purchased an item that appeared on the invoices merely as "Christina 500". The testimony is not clear whether this item is a wig or a fall. When asked what is a "Christina 500 machine made", Mr. Krissman inquired whether the invoice said machine-made wig. When informed that it listed the item as "just Christina 500", the witness determined that it was a fall. Mr. Borghese, on the other hand, testified on direct examination that he thought the "Christina 500", was a wig. He was unable to determine this from the name itself, and had to rely on the price listed on the invoice to determine whether it was a wig or a fall. Since plaintiff's witnesses cannot agree on the nature of the merchandise, plaintiff has failed to rebut the presumptively correct finding of value of the appraiser as to the "Christina 500".

The remainder of the imported merchandise in this action does not appear on any Italwig price list. Defendant's responses to plaintiff's first interrogatories reveal that these articles were valued on the basis of being "such" as articles that appeared on Italwig's pricelists, or "such" as articles not appearing on an Italwig pricelist, but sold to customers other than Majestic.

■ Defendant's responses to plaintiff's first interrogatories show that the "Roman" wig sold to Majestic by Italwig, a hand-tied wig of Oriental hair, was appraised on the basis of being "such" as the "B/Italwig" hand-tied wig sold to Majestic and the "Katy" wig sold to Edith Imre Hair fashions, Inc. of New York. Except that all three wigs were hand tied of rather long hair, the wigs were not the same. According to the uncontradicted testimony of plaintiff's witnesses, the wigs differed not only in length, but also in weight and in hair type. Since the "Roman" wig differed considerably from the "B/Italwig" and the "Katy" wig, this item was incorrectly appraised by Customs.

■ An item appearing on the invoices as "Wiglet 'C'" was sold to Edith Imre Hair Fashions, Inc. and to Sallee Imports, Inc. of Oakland, California, at prices higher than those paid by Majestic. Mr. Borghese's testimony revealed differences among the wiglets sold to these three purchasers. Edith Imre Hair Fashions, Inc. required the front rows of hair to be hand knotted, and the wiglet came in a four-color box with a comb and bow. Although Sallee Imports, Inc. did not require the front rows to be hand knotted, the wiglet came in fancy packaging with a scarf. This wiglet also had about two more ounces of hair than Majestic's wiglet. In contrast, the "Wiglet 'C'" purchased by Majestic had no hand knotting, and came in a plain poly bag without any accessories. Mr. Borghese pointed out that, because Majestic accepted the wiglet without accessories and fancy packaging, the "Wiglet 'C'" cost Majestic less. Therefore, it was incorrect for the appraiser to value

the "Wiglet 'C' " sold to Majestic as "such" as the "Wiglet 'C' " sold either to Edith Imre Hair Fashions, Inc. or to Sallee Imports, Inc.

Defendant's responses to plaintiff's first interrogatories reveal that the "Monica" fall and the "Gioia" wig were appraised on the basis of "such" merchandise. Defendant, however, was unable to provide information for sales of merchandise "such" as the "Gioia" wig and "Monica" fall. Mr. Borghese testified without contradiction that these two items were sold exclusively to Majestic, and were not similar to any other article sold by Italwig. Italwig sold an item known as "Monica" to Edith Imre Hair Fashions, Inc., but that item was a wig and not a fall. The "Gioia" was a "shorty" wig made from the combings left over from the manufacture of other wigs and falls. As defendant introduced no evidence of sales or offers for sale of merchandise "such" as the "Monica" fall and the "Gioia" wig, plaintiff's evidence overcomes the presumption of correctness attaching to the appraiser's finding of value.

In summary, plaintiff has failed to overcome the presumption of correctness attaching to the appraiser's findings of value as to the first order of "Italwigs", and as to all orders of the "B/Italwig" hand tied, the "B/Italwig" machine made, and the "Christina 500". The appraiser's findings of value as to these items of merchandise are, therefore, affirmed.

■ The plaintiff has overcome the presumption of correctness attaching to the appraiser's findings of value as to the "Roman" wig, the "Wiglet 'C' ", the "Monica" fall, the "Gioia" wig and all the "Italwigs" except those in entry No. 107666. In rebutting the presumption of correctness as to these items of merchandise, plaintiff has met only part of its dual burden of proof. To prevail upon its contention that the invoice unit values, as entered, represent the proper dutiable value, plaintiff must establish that such or similar merchandise was freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States at the invoice unit values, as entered. *Andy Mohan, Inc. v. United States*, 396 F.Supp. 1280, 74 Cust.Ct. 105 (1975), *aff'd*, 537 F.2d 516, 63 CCPA 104 (1976); *Millmaster International Inc. v. United States*, 427 F.2d 811, 57 CCPA 108, *modified on other grounds*, 429 F.2d 985, 57 CCPA 114 (1970).

The record contains no evidence that during the period in question such or similar merchandise was actually sold or offered for sale at the invoice unit values, as entered.

■ Mr. Borghese's testimony indicates that Italwig did not sell merchandise that was "such or similar" to any customer other than Majestic, "except in small quantities, and in areas different than the California area." The sales to other customers referred to the "B/Italwig" sold to Todd Imports of Portland, Oregon. On this testimony, plaintiff's claim is based on *offers for* sale since none of the merchandise remaining in issue ("Roman" wig, "Wiglet 'C' " as sold to Majestic, "Monica" fall, "Gioia" wig and the remaining "Italwigs") was sold to customers other than Majestic. In the absence of sales, section 402(b) requires that export value be determined on the basis of the price at which such merchandise is "freely offered" for sale. See *Aceto Chemical Co. v. United States*, 51 CCPA 121, C.A.D. 846 (1964); *United States v. Thomas P. Gonzalez Corp.*, 66 Cust.Ct. 597, A.R.D. 283 (1971); *Louis Goldey Co. v. United States*, 55 Cust.Ct. 759, A.R.D. 196 (1965).

■ The record in the case at bar does not support plaintiff's alternative claim with respect to the "selected purchaser" provision within the meaning of section 402(f)(1)(B) of the Tariff Act of 1930, as amended. Both Mr. Krissman and Mr. Borghese testified that there was no agreement between Majestic and Italwig whereby Italwig would sell only to Majestic in the United States. Mr. Borghese stated that he did not like selling the same merchandise that he sold to Majestic to other customers

in California. This was Mr. Borghese's personal choice however, for as conceded, Italwig was not tied to Majestic by a contract of exclusivity. Selected purchasers at wholesale are those designated and selected by the seller as purchasers to whom the seller restricts its sales to the exclusion of all other purchasers at wholesale. *Aceto Chemical Co. v. United States*, 51 CCPA at 127; *Picker Corp. v. United States*, 68 Cust.Ct. 276, 283, R.D. 11768 (1972), *aff'd*, 75 Cust.Ct. 171, A.R.D. 323 (1975); *H. M. Young Associates, Inc. v. United States*, 60 Cust.Ct. 842, 850, R.D. 11517 (1968).

Since Italwig did not restrict the sales of its merchandise to Majestic, Majestic is not a selected purchaser. Consequently, export value may not be predicated solely on the basis of the price paid for the imported merchandise. *Mitsubishi International Corp. v. United States*, 72 Cust.Ct. 34, C.D. 4501 (1974); *Agricolas de Mexico, S. de R. L. de C. V. v. United States*, 66 Cust.Ct. 612, A.R.D. 285 (1971). In this case, therefore, there must be evidence that the claimed prices, as represented by the invoice unit values, were the prices at which the merchandise was freely offered to all purchasers at wholesale during the period in question.

The record contains no proof whatsoever of offers of such or similar merchandise to other purchasers at wholesale. Hence, plaintiff's claim that expert value of the imported merchandise is represented by the invoice unit values, as entered, must fail.

There are several means by which the freely offered price can be established. Ordinarily, a freely offered price can be established by a manufacturer's pricelist that is freely circulated in the trade. *Judson Sheldon International Corp. v. United States*, 51 Cust.Ct. 374, R.D. 10586 (1963) *aff'd*, 54 Cust.Ct. 773, A.R.D. 183 (1965); *Sanford Steel Pipe Products Co. v. United States*, 383 F.Supp. 837, 73 Cust.Ct. 155 (1974). The only pricelists introduced into evidence in this action were introduced by defendant. Those pricelists do not include the merchandise still in issue. Mr. Borghese testified that the pricelist was only the departure point for negotiations between the customer and Italwig, which usually determined the price. Only in the case of "small volume" purchasers were sales at list price. Additionally, a pricelist was maintained only for those articles that were displayed in Italwig's showroom, which did not represent the full line of products Italwig was capable of manufacturing, and had manufactured in the past.

In the absence of pricelists, other means were available to plaintiff to prove the freely offered price. Some examples include prices contained in catalogues, letters, telegrams, records of price negotiation, and other communications between Italwig and potential customers. *Sanford Steel Pipe Products Co. v. United States*, 383 F.Supp. 837, 73 Cust.Ct. 155 (1974). Plaintiff presented no such evidence to the court. Its evidence was restricted to demonstrating that Majestic freely negotiated prices in arm's length negotiations with Italwig, representing the actual cost of manufacture, plus an amount to cover Italian taxes and manufacturer's profit.

Plaintiff contends that "[i]t is a long established principle that *bona fide* arm's length transactions between unrelated parties are sufficient to establish export value", and relies on *Ernest Lowenstein, Inc. v. United States*, 425 F.Supp. 856, 78 Cust.Ct. 169 (1977), *aff'd*, 451 F.Supp. 988, 80 Cust.Ct. 211 (1978) and *Wood v. United States*, 505 F.2d 1400, 62 CCPA 25 (1974).

Plaintiff's reliance on these cases is misplaced. Both the *Lowenstein* and *Wood* cases dealt with the establishment of export value in the case of a *selected purchaser*. They refer to the means of proving a price that "fairly reflects market value", which establishes the export value element of "freely sold or, in the absence of sales, offered for sale". The language of these cases, that export value may be established by prices negotiated in *bona fide* arm's length negotiations that establish a price fairly reflecting market value, is not applicable in the present action since Majestic is not a selected purchaser.

Recognizing that the *Lowenstein* and *Wood* cases dealt with selected purchasers, plaintiff submits that "there can be no valid reason for applying a more restrictive rule to the transactions in the case at bar". The reason, of course, is to be found in the specific provisions of the applicable statute. In other cases in which the plaintiff is not a "selected purchaser", the "freely sold or offered for sale" element is met by demonstrating that the merchandise is sold or offered for sale to *all purchasers at wholesale*. Section 402(f)(1). Indeed, section 402(f)(1) defines "freely sold or, in the absence of sales, offered for sale" in terms of sales or offers "(A) to all purchasers at wholesale, *or* (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise". (Emphasis added.) The statute expressly establishes *separate and different* standards in the case of selected purchasers, or all other wholesale purchasers. Proof of a price "which fairly reflects the market value of the merchandise" does not establish the price at which the merchandise is sold or offered to "all purchasers at wholesale".

Plaintiff's evidence, designed to show that the price to Majestic was determined by *bona fide* arm's length negotiation, may establish a price "which fairly reflects the market value of the merchandise", but it does not establish a price at which the merchandise is freely offered to all purchasers at wholesale. Citing *Superior Merchandise Co. v. United States*, 54 Cust.Ct. 781, A.R.D. 185 (1965), plaintiff asserts that the fact the price is determined through negotiation does not negate its use in finding export value, provided it otherwise meets the statutory requirements. The determinative words, however, are "provided it otherwise meets the statutory requirements" of export value. In the *Superior Merchandise Co.* case, glass bead necklets produced from "irregular" glass beads were offered at 19½ cents per dozen, plus packing. This offer was rejected since the cost, plus packing, would exceed 20 cents per dozen, the level at which the duty would almost double. The importer indicated that it would be interested if the price were below 20 cents per dozen, packed. Sales were made to the importer and others after the offering price was reduced to 18¼ cents per dozen, plus packing, or 19½ cents per dozen, packed, either price being below 20 cents per dozen. The court, in the *Superior Merchandise Co.* case, held that "[i]t may be that these offers arose originally out of negotiations and bargaining by Superior and [manufacturer], but if, as we find, offers at the same price were made generally to persons interested in buying the merchandise, this price was 'freely offered.'" 54 Cust.Ct. at 787.

In the present case, plaintiff presented no evidence of offers of "such or similar" merchandise to all purchasers at wholesale for exportation to the United States during the period in question. The negotiated price, represented in the invoice unit values, as entered, which plaintiff alleges to be the export value, does not "otherwise meet the statutory requirements of export value" as required by the *Superior Merchandise Co.* case.

Although plaintiff successfully rebutted the presumption of correctness attaching to the appraiser's findings of value as to the "Italwigs", except for the first order, "Roman" wigs, "Wiglet 'C'", "Monica" falls, and the "Gioia" wigs, it failed to establish that the invoice unit values, as entered, represent the proper dutiable values as claimed. As to these items of merchandise, therefore, plaintiff's appeals for reappraisement are dismissed. Since plaintiff has failed to establish its claimed values, the appraised values remain in effect. *Millmaster International Inc. v. United States*, 427 F.2d 811, 813–14, 57 CCPA 108, 110–11, *modified on other grounds*, 429 F.2d 985, 57 CCPA 114 (1970).

In summary, the findings of value by the appraiser as to the first order of "Italwigs", all orders of "B/Italwigs", hand tied and machine made, and the "Christina 500" are affirmed. As to the remaining merchandise, the "Italwigs" after the first order, the "Roman" wigs, the "Wiglet 'C'", the "Monica" falls, and the "Gioia" wigs, the appeals for reappraisement are dismissed

with the appraised values remaining in effect. Judgment will be entered accordingly.