C. J. TOWER & SONS OF BUFFALO, INC., Plaintiff,

v.

UNITED STATES, Defendant.

Court No. 79–12–02021.

United States Court of International Trade.

April 28, 1981.

Cushman, Darby & Cushman, Washington, D. C. (Robert A. Vanderhye, Washington, D. C., at the trial and on the briefs), for plaintiff.

Thomas S. Martin, Acting Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, New York City (Jerry P. Wiskin, New York

City, at the trial and on the brief), for defendant.

FORD, Judge:

Plaintiff by this action seeks reclassification of certain articles described on the invoices variously as automatic livestock waterers or animal nipple drinkers,[1] model Nos. 10094 and 10095, imported from Canada. Customs classified the imported merchandise under item 680.22, TSUS, as valves and similar devices used to control the flow of liquids, and assessed duty thereon at the rate of 11 per centum ad valorem.

Plaintiff contends the merchandise is entitled to entry free of duty as agricultural implements under the provisions of item 666.00, TSUS.

The pertinent statutory provisions provide as follows:

> Schedule 6, Part 4, Subpart J:
>
> Taps, cocks, valves and similar devices, however operated, used to control the flow of liquids, gases or solids, all the foregoing and parts thereof:
>
> > Hand-operated and check, and parts thereof:
> >
> > \* \* \* \* \* \* \*
>
> 680.22    Other ................. ....11% ad val.
>
> Schedule 6, Part 4, Subpart C:
>
> Subpart C headnote:
>
> > 1. The provisions of item 666.00 for "agricultural and horticultural implements not specially provided for" do not apply to any of the articles provided for in schedule 6, part 2, part 3 (subparts A through F, inclusive) part 5 (except item 688.40), or part 6, or to any of the articles specially provided for elsewhere in the tariff schedules, but interchangeable agricultural and horticultural implements are classifiable in item 666.00 even if mounted at the time of importation on a tractor provided for in part 6B of this schedule.
>
> 666.00    Machinery for soil preparation and cultivation, agricultural drills and planters, fertilizer spreaders, harvesting and threshing machinery, hay or grass mowers (except lawn mowers), farm wagons and carts, milking machines, on-farm equipment for the handling or drying of agricultural or horticultural products, and agricultural and horticultural implements not specially provided for, and parts of any of the foregoing ...................... Free

The record consists of the testimony of two witnesses called on behalf of plaintiff and receipt in evidence of eighteen exhibits on its behalf. Defendant offered, and there were received in evidence, seven exhibits.

Dr. Leland F. Tribble, a professor of animal science at Texas Tech University, was called on behalf of plaintiff. The witness testified that he received from the University of Missouri a bachelor of science degree in animal husbandry, a master of science degree in animal husbandry, and a doctor of philosophy in animal nutrition. His background included being a member of the faculties of the University of Missouri and Kansas State University, as well as doing research as a nonruminant nutritionist for the United States Department of Agriculture in Washington, D. C.

Dr. Tribble stated his entire career has been primarily in the area of nutrition and most of his work related to swine testing, and the production and management of swine. Based upon this experience the witness was familiar with the various types of systems used for watering swine. Basically there are three types of systems: Watering in a trough, which has to be filled by the farmer, and the so-called automatic waterers consisting of the bowl-type waterer and the nipple-type waterer. The bowl-type waterer contains a float valve which is nose-operated and releases water in the bowl for drinking. Exhibit 1 was identified by Dr. Tribble as one type of bowl waterer. Exhibit 3, the imported merchandise, is representative of the nipple-type waterer.

Plaintiff's exhibit 4 is a drawing of plaintiff's exhibit 3. Dr. Tribble testified that the main components of the valve consist of items numbers one, six, eight, ten and twelve. Item number one of exhibit 4 is the valve body. Item number eight of exhibit 4 represents the passageway for the water to pass through the valve. Item

---

[1] Also referred to in the exhibits and record as "Baby Pig Valves," nipple valves, hog nipple waterers, etc.

number ten is the valve seat and number twelve is used to close the valve or stop the flow of water. In addition there is the actuator, which is number six.

According to Dr. Tribble the purpose of the valve is to control the flow of water, that is to open or close the valve which starts and stops the flow of water. In addition to the above components, there is the water tube which leads from the valve body and protects the actuator from being accidently actuated. The water tube is identified on exhibit 4 as item number 5, and the sloping section of the water tube is represented as item number fifteen. The main purpose of items five and fifteen is to allow the animal to actuate the valve by biting on the actuator, item 6, which permits the water to be delivered into the pig's mouth. In addition to the foregoing, the imported item has a water flow control, which is designated as item thirteen on exhibit 4, and which permits a certain amount of water to flow into the valve. Item number fourteen is a filter which protects the valve from getting dirt in it. The filter is held in place by a filter holder, designated as item twenty. This total unit was considered by Dr. Tribble to be a nipple waterer of the so-called "bite" type since the pig has to bite on it to actuate it. Dr. Tribble has never known of this type of unit being called a valve.

Dr. Tribble has done research at Texas Tech University on a comparison of bowl-type and nipple-type waterers. The results of this research are contained in plaintiff's exhibit 9 at page 49 and plaintiff's exhibit 10 at page 41. The end result of these tests on an identical number of pigs in a pen, fed the identical food, resulted in a saving of one gallon of water a day per pen for those using the nipple waterer as against the bowl waterer. In addition, the nipple type waterer has the advantage of delivering clean water to the pig, whereas the bowl type waterer can accumulate the residue of food from the mouth of the pig as well as other contaminants. Accordingly, the nipple waterer has the advantage of cleanliness of supply. The witness also indicated the nipple waterer is considerably cheaper than the bowl-type waterer.

Dr. Tribble stated the chief use of the imported merchandise is as an automatic hog waterer, and he was not aware of any other use for said item.

On cross-examination Dr. Tribble stated he did not consider a pigpen to function as a cage other than that they both confine the animal. While the witness indicated he had never heard of a device similar to exhibit 3 referred to as a valve or nipple valve, he stated he was familiar with the Lixit waterer. His attention was directed to a magazine entitled "Pig American" received in evidence as defendant's exhibit A, and particularly to page 51 which contained an advertisement for the Lixit L–70 hog waterer, wherein it was referred to as a nipple valve for hogs. The witness was directed to defendant's exhibit C which depicted articles of the same class or kind as exhibit 3, wherein they were described as "Baby Pig Valve" and "Pig Valve."

On redirect examination Dr. Tribble testified that if someone referred to exhibit 3 as a valve, it would not be an accurate description of the device. The witness considered the use of the term "valve" as misleading.

Plaintiff then called Helmut Rader, the president of Monoflo International, Inc., the actual importer herein. The witness testified that Monoflo International is a business involved solely in manufacturing and/or importing watering devices for animals which he sells throughout the United States. The witness also indicated he exported over 50 percent of these items to other countries. His company imports both exhibits 1 and 3 which are devices which supply water to pigs. The witness personally designed hog waterers. He is presently involved in the manufacture, importation, sale, promotion and distribution of hog waterers in the United States. He presently imports model Nos. 10094 and 10095, which do not differ in design but are different in size. The larger type is used for pigs and the smaller one for piglets up to 25 pounds.

The functions of the watering tube, according to Mr. Rader, are twofold. One is

to direct the water to the mouth of the animal and the other is to prevent the accidental operation of the valve actuator. In addition to the valve and watering tube, Mr. Rader testified that the imported item contains an actuator, a flow control and a filter screen. In the opinion of Mr. Rader the flow tube of exhibit 3 performs the same function as the bowl in exhibit 1, that is to permit the animal to obtain water.

Mr. Rader testified there are basically three channels of supply of hog waterers. The first channel is a farm equipment distributor, the second is a "builder of complete farms," and the third is the farmer. The witness attends trade shows and advertises in papers and magazines. The major trade show is the Pork Congress. At the shows his company distributes brochures such as exhibit 13.

The witness stated that he had heard of devices such as exhibit 3 called valves, and he has in fact called them valves himself primarily since such term is utilized in England. Such items are also referred to as "nipples," "nozzles" and "water drinkers." In the opinion of Mr. Rader, exhibit 3 incorporates a valve as a component part but has other components. Accordingly, the witness stated the name "valve" is not descriptive of this item. Mr. Rader also testified that there is a big cost advantage of exhibit 3 over exhibit 1.

On cross-examination the witness testified that when Monoflo sells devices such as exhibit 3 there are package inserts, such as defendant's collective exhibit E contained therein. This literature is prepared in Canada but contains the name of Monoflo. The witness testified that exhibit E does not accurately reflect the merchandise since exhibit 3 does not contain a bracket as imported. The witness also admitted that exhibit C, which described the same class or kind of articles such as exhibit 3 as a "Baby Pig Valve," was distributed in the United States to Monoflo customers. He did not consider this advertising material to be misleading. The witness's attention was directed to exhibit F, which described the imported merchandise as "Monoflo—First

Name in Hog Valves" and "Baby Pig Valve for High-Low Press." The valve in the instant importation, according to witness Rader, does not control the flow but merely permits the valve to be open or closed.

On redirect examination Mr. Rader testified that exhibit E was prepared in Canada by a Mr. Bauman, who is the manufacturer of the imported merchandise. The purpose of the literature was to familiarize the farmer with the drinker and its various parts.

■■■■ The record as made herein establishes to the satisfaction of the court that the sole and, therefore, chief use of the imported merchandise is to supply water to hogs. The breeding and rearing of animals for the production of food (animal husbandry) constitutes for tariff purposes an agricultural pursuit. *United States v. Boker & Co.*, 6 Ct.Cust.Appls. 243, T.D. 35472 (1915). The court is likewise satisfied that the imported waterers are implements within the intendment of Congress. In *United States v. S. S. Perry*, 25 CCPA 282, T.D. 49395 (1938), the court held celluloid poultry leg bands, used for identification purposes, to be agricultural implements. The court reasoned, since the bands were not used for ornamental purpose but for the efficient raising of poultry, they are agricultural implements. Additionally, the *Perry* case enunciated the principle that Congress intended to encourage agriculture by affording free importation to agricultural implements and that, therefore, the provisions should be given broad and liberal construction. *See also Border Brokerage Co., Inc. v. United States*, 65 Cust.Ct. 277, C.D. 4089, 343 F.Supp. 1396 (1970), *aff'd*, 59 CCPA 151, C.A.D. 1058, 461 F.2d 1383 (1972).

However, not every agricultural implement was intended by Congress to be afforded free entry since headnote 1, part 4C of schedule 6 provides an exclusion of "any of the articles specially provided for elsewhere in the tariff schedules * * *." A brief scanning of the TSUS also establishes a number of agricultural or horticultural tools, implements or machines were not intended to be entitled to free entry, i. e.,

lawnmowers, item 666.10, TSUS, certain cream separators, item 661.85, agricultural or horticultural hoes and rakes, item 648.55, and agricultural or horticultural forks, item 648.61.

Defendant, in any event, relying on headnote 1 of part 4C, schedule 6, contends the imported articles are valves or similar devices used to control the flow of liquids and, as such, are specifically provided for and, therefore, excluded from classification under item 666.00. Plaintiff contends the merchandise is "more than" a valve and, therefore, may properly be classified as an agricultural implement under item 666.00. It is the position of plaintiff that by virtue of three specific elements of the waterers— the flow restrictor, the filter screen, and the watering tube—the imported merchandise is no longer a valve. The diagram of the waterer in defendant's Exhibit E, set forth below, is of assistance in determining this theory.

The component parts of the imported merchandise are as follows:

1. Valve body
2. O-ring seat
3. Valve stem
4. Spring
5. Orifice (flow restrictor)
6. Filter screen
7. Filter screen holder
A. Referred to in the testimony as the "watering tube."

The operation of the waterer is accomplished by the hog placing its mouth over the cutout portion of the valve body and biting down on the valve stem (3). This permits the water to pass through the filter which screens out any dirt, etc. and then pass directly into the mouth of the hog by means of the so-called watering tube (A). The flow restrictor is merely a thin piece of plastic with a small orifice which permits the amount of water that can pass through the orifice. There are various size restrictors which may be utilized depending upon the water pressure.

The "more than" doctrine was considered in *E. Green & Son (New York), Inc. v. United States*, 59 CCPA 31, C.A.D. 1032, 450 F.2d 1396 (1971) wherein the court made the following observation:

Only the most general of rules can be ascertained from the previous decisions dealing with the "more than" doctrine, and it appears that each case must in the final analysis be determined on its own facts. See *United Carr Fastener Corp. v. United States*, 54 CCPA 89, C.A.D. 913 (1967), and the cases cited therein. In order to determine if an article is more than that provided for in a particular tariff provision, it is necessary to ascertain the common meaning of the tariff provision and compare it with the merchandise in issue. It is well established that in determining the common meaning of a term or word used in a tariff provision, court decisions, dictionary definitions, and other lexicographical authorities may be considered. [P. 34, 450 F.2d 1396.]

The advice in *Green* was subsequently repeated in *The Englishtown Corporation v. United States*, 64 CCPA 84, C.A.D. 1187, 553 F.2d 1258 (1977). Accordingly, the common meaning of the term must be determined and compared with the merchandise before the court. The record establishes, and the parties agree, the waterer contains a valve. By virtue of its operation, the fact that the valve is either open or closed, brings the valve involved within the category of a gate valve.

*Webster's Third New International Dictionary* (1965) contains the following definitions:

valve * * * b(1): any of numerous mechanical devices by which the flow of liquid, air or other gas, or loose material in bulk may be started, stopped, or regulated by a movable part that opens, shuts, or partially obstructs one or more ports or passageways; also: the movable part of such a device—compare COCK 2; see CHECK VALVE, GATE VALVE, PISTON VALVE, SAFETY VALVE.

*gate valve* n: a valve in a pipeline consisting essentially of a flat or wedge-shaped gate that can be lowered into a seat to seal off the line or raised into an external recess so that the full area of the line is open * * *

The *Summaries of Trade and Tariff Information* (1969), Schedule 6, Volume 10, describes gate valves, among others, at page 81, as follows:

This summary relates to taps, cocks, valves, and similar devices and parts of the foregoing. These articles, which are used to control the flow of liquids, gases, and solids, may be operated by hand; by a motor, solenoid, or clock movement; or by a device such as a spring, counterweight, float, thermostat, pressure capsule, or electronic sensing device.

* * * Common types of valves include gate valves, globe and angle valves, check valves, and safety valves, which vary in design and in the metals of which they are constructed in accordance with the function to be performed. Gate valves are generally regarded as free-flow valves, i. e., they are usually completely open or completely closed, and are not normally intended for throttling or regulating the volume of material passing through a piping system.

Additionally at page 87 the following information is contained:

* * * Imports entered under item 680.-22 include such diverse articles as animal-cage watering valves, valves for irrigation systems, check valves for heat exchangers, and many different types of gate valves. * * *

The tariff provisions for valves cover hand-operated and automatic valves. The term "hand-operated" covers those valves which are not automatic. In the case at bar, while the valve is activated by the hog's mouth, it falls within the category of hand-operated as against automatic operation as indicated *supra*. It is clear based upon the foregoing that Congress intended to encompass within the provisions for taps, cocks, valves and similar devices those articles used to control the flow of liquids, etc.

This is the primary and sole purpose of the imported merchandise. The formation of the so-called watering tube to *direct* the flow of water into the mouth of the hog does not differ, in the opinion of the court, from the spigot involved in the kitchen faucets involved in *Durst Industries, Inc. v. United States*, 73 Cust.Ct. 160, C.D. 4568 (1974) which also *directed* the flow of water.

The court is aware of the fact that plaintiff's exhibit 1, a hog bowl waterer, is permitted entry free of duty as an agricultural implement. However, examination of plaintiff's exhibit 1 and the merchandise before the court establishes the reason for the different classification, notwithstanding the fact they both perform the same function.

In view of the foregoing, it is unnecessary to consider defendant's alternative contention as "similar devices" or the other positions urged by both parties.

The claim of plaintiff is overruled. Judgment will be entered accordingly.